## BRUNSWICK GAS LIGHT COMPANY

*vs.*

## UNITED GAS, FUEL AND LIGHT COMPANY.

Cumberland.   Opinion August 11, 1893.

*Corporations.   Sale of Franchise.   Contracts Ultra Vires.*

Public or *quasi* public corporations, which possess and exercise the right of eminent domain, or its equivalent, owe duties to the public as well as to their stockholders; and they cannot sell or lease their corporate powers and privileges, and thereby disable themselves from performing their public duties without legislative authority.

A more serious objection to the traffic in corporate franchises is the ease with which such a power could be used to create monopolies.

A gas company, which possesses and exercises the right to lay its pipes in the public streets, can not sell, lease, or assign its corporate rights and privileges to another gas company without the consent of the legislature.

A contract made by a corporation which is unlawful and void, because beyond the scope of its corporate powers, does not by being carried into execution become lawful and valid.   The proper remedy of the aggrieved party is to disaffirm the contract and sue to recover as on a *quantum meruit* the value of what the defendant has actually received the benefit of.

ON EXCEPTIONS.

This was an action of covenant broken to recover damages for breach of the covenants in a lease.   The case was tried by the justice of the Superior Court, for Cumberland county, without the intervention of a jury, subject to exceptions in matters of

law. From the bill of exceptions, it appeared that the plaintiff was incorporated by special act of the legislature, in 1854, to carry on the manufacture, distribution and sale of gas for street lighting, the laying of pipes in the streets, &c.

The defendant was incorporated under the general laws of Maine, in 1888; and its purposes, under the articles of association, were to operate " a gas process for manufacturing fuel and illuminating gas from oil and other raw products; to light by gas the streets, parks, grounds, buildings and business places of persons and corporations; to manufacture, use, supply, distribute and furnish, light, heat and motive power by gas for heating and manufacturing purposes deemed for the interest of the corporation; to erect and maintain posts and other fixtures, to lay down and maintain such underground pipes and other appurtenances as may be deemed necessary for the objects of the corporation, wherever the same may be lawfully done; to manufacture, lease, purchase and otherwise acquire, deal in, manage, use and sell any and all machinery, fixtures, appurtenances, appliances and plants for using and furnishing light, heat and power and for any and all purposes for which gas is now used or may hereafter be used; to lease, purchase, or otherwise acquire, manage, control, use and sell real and personal estate, patents, patent rights, inventions and processes and improvements thereon, and interests therein and rights thereunder, and any and all other property, privileges and easements, rights and things whatsoever deemed necessary or convenient for carrying on the business of the corporation, with power to authorize other corporations and persons to manufacture, use, sell and operate thereunder, and to do any and all acts and things connected with or deemed necessary for carrying on the business of the corporation and the general business of furnishing and supplying heat, light and power by means of gas; to issue bonds secured by mortgage on the property and franchise of said company for the purpose of raising money for the use of the company; and to have and exercise all the rights and powers and privileges appertaining to corporations under the general laws of the State of Maine."

For several years prior to April, 1889, the plaintiff corporation under its charter had supplied the citizens of Brunswick with gas. Its operations had not been financially successful. At that time it was heavily in debt, not only on account of bonds which it had issued, secured by a mortgage on its real estate, and other property, but a considerable floating debt existed as well. Some of the bonds at that time were overdue, and the holders were threatening foreclosure. At this time B. G. Dennison was the President of the Brunswick Gas Light Company, and Marcus R. Williams was president of the United Gas, Fuel and Light Company.

At the time of the execution of the lease of the Brunswick property, all the directors of the defendant company, including its president, were residents of New York city and its vicinity.

This defendant was the owner of what is known as the Avery process for the manufacture of gas. Not long after the election of these directors, president Williams came to Maine for the purpose of introducing that process in this State.

For some time prior to said first day of April, negotiations had been pending between these two officers relating to a lease of the plaintiff's property by the defendant company ; the defendant company prior to this time having entered into possession of the gas plant in Bath, under some kind of an arrangement with the company originally operating the Bath plant. These negotiations terminated on the first day of April, 1889, by the execution of a lease.

Under this lease and on the day of its execution, the defendant company entered into possession of the plaintiff's gas plant at Brunswick.

The case does not show that, prior to the execution of the lease, the directors of the defendant company expressly authorized by formal vote their president, Williams, to execute the lease in their behalf. The defendant company at the trial denied the authority of Williams to execute the lease of the Brunswick plant, but it appeared as facts in the case that the works at Brunswick and at Bath, which the defendant company admitted were operated by its authority, had a common manager,

whose salary was not apportioned between them, kept common books of account and bought supplies in common. And further, that both works at times used the Avery process for the manufacture of gas which the defendant company alone had the right to use.

From these facts, and other testimony in the case the court found that Williams was the agent of the defendant company to arrange with different gas companies in the State for the introduction of the Avery process; that the directors of the defendant company had full knowledge that the works at Brunswick were operated by their company; that they acquiesced in the same and ratified the action of Williams in the premises, — no disavowal of the authority of president Williams to execute the Brunswick lease ever having been communicated to the plaintiff company prior to the commencement of this suit.

The defendant company continued to operate the Brunswick works until September 15, 1890, when voluntarily, and without the fault of the plaintiff company, they abandoned the works and ceased to operate them.

Upon these facts the court ruled as matter of law that the plaintiff company and the defendant company had power to execute the lease in question, and that the defendant company was liable in damages for the breach of the convenants contained in said lease.

The defendant company did not indorse any guaranty upon the outstanding bonds of the plaintiff company, nor did it give any guaranty to the holders of the same further than is contained in the provisions of the lease itself. The damage sustained by the plaintiff on this account is of such an uncertain character that the court allowed the plaintiff nothing for the failure of the defendant to fulfill those covenants contained in the lease.

For prospective damages on account of the breach of covenants of the lease, the court awarded the plaintiff the sum of four thousand five hundred dollars ($4500) less three hundred dollars, the value of defendant's improvements while in possession, the plaintiff having expressed a willingness to make a deduction equal to the difference between the value of the plant April

1, 1889, when the defendant took possession, and its value September 15, 1890, when it abandoned possession.

After hearing the evidence and arguments of each party, and considering the same, the court decided that the said indenture is the defendant's deed in manner and form as the plaintiff in its writ has declared against it, and awarded damages in the sum of four thousand nine hundred and eighty-six dollars and fifty-six cents.

Among other provisions the lease contains the following:

"The lessee covenants and agrees to guarantee during the term of this lease the present bonded indebtedness of the lessor, and its renewal, and a further issue of bonds to liquidate any or all of the lessor's existing floating indebtedness. The lessor covenanting on its part not to increase its total indebtedness during the term of this lease and to use all reasonable efforts to pay the same as it matures. And in all bonds of the lessor purchased by the lessee, the lessee shall receive five per cent interest per annum, payable semi-annually, and may deduct said interest from the rent.

"It is further agreed that the said lessor will sell, assign, and transfer the capital stock of said Brunswick Gas Light Company, the par value thereof being fifty dollars ($50), which stock is to remain at the present amount, twenty thousand dollars ($20,000), at any time within eight years on the following basis: The said lessee is to pay for said capital stock at the rate of forty dollars ($40) per share."

The defendant pleaded *non est factum*, with a brief statement, and after judgment took exceptions to this court.

The defense relied upon by the defendant was that the lease was negotiated and executed by an unauthorized agent whose acts were never ratified; that the plaintiff had no legal right to execute the lease, and that in so doing its acts were *ultra vires* and void; that the defendant company had no right to guarantee the bonds, and its agreement to do so was *ultra vires* and void; and that at the termination of the lease there was due the defendant company in set-off, for extensions, improvements and additions, about $1500.

*Barrett Potter*, for plaintiff.

*G. W. Heselton*, for defendant.

WALTON, J.    The question is whether a gas company, which possesses and exercises the right to lay its pipes in the public streets, can sell, lease, or assign its corporate rights and privileges to another gas company, without the consent of the legislature.

We think the question must be answered in the negative. Corporations possessing and exercising the right of eminent domain, owe duties to the public from the performance of which they are not allowed to escape by a sale or lease of their franchises, without first obtaining the consent of the legislature. The franchise of a corporation having the right to receive tolls may be levied on to satisfy an execution against the corporation, and in this way it may be deprived of its corporate powers and privileges.    And they may be lost by the foreclosure of a legally executed mortgage.    And they may also be lost by laches in reclaiming them when they have been illegally sold, leased, or assigned.    But subject to these well-defined exceptions, it is now settled by an overwhelming weight of authority that public or *quasi* public corporations, which possess and exercise the right of eminent domain, or its equivalent, owe duties to the public, as well as to their stockholders ; and that they can not sell or lease their corporate powers and privileges, and thereby disable themselves from performing their public duties, without legislative authority.    It is the duty of gas companies, water companies, electric light companies, telegraph and telephone companies, street railway companies, and all similar corporations, which have obtained the right to use the public streets for the erection or extension of their works, to serve the public faithfully and impartially, and at reasonable rates.    And this is a duty the performance of which may be enforced by the courts.    And one reason why these corporations are not allowed to sell or lease their corporate powers and franchises, without legislative authority, is that if they were able to do so, they might thereby disable themselves from the performance of their

public duties, and thus escape from the power of the courts and of the legislature to enforce their performance.

But a still more serious objection to the traffic in corporate franchises is the ease with which such a power could be used to create monopolies. By its exercise, a single corporation could easily become possessed of the corporate powers and privileges of all its rivals, and thereby annihilate competition and obtain a complete control of the markets. Such combinations are usually hurtful, and sound public policy requires that they be kept under legislative supervision and restraint.

To the argument that similar combinations may be made by individuals, it has been aptly replied that men are mortal, and their combinations short-lived, but corporations are immortal, and their combinations and acquisitions may go on forever; that they may add field to field, wealth to wealth, and power to power, till they become too strong for the government itself; that all experience shows that such accumulations of wealth and power are dangerous to the public welfare; and that while society can endure the accumulations and combinations of mortals, which must end at the grave, it can not endure similar accumulations and combinations of power by corporations, which may continue forever.

In a case in New Jersey, decided in August, 1892, it is said that corporations which engage in a *quasi* public occupation, such as railway, water, gas, telegraph, and similar corporations, are created upon the hypothesis that they will be a public benefit; that they usually possess the right of eminent domain, and not unfrequently the use of the public highways is accorded to them; and that while the state confers upon them these special and extraordinary privileges, it at the same time exacts from them the performance of public duties; that such corporations hold their franchises not merely in trust for the pecuniary profit of their stockholders, but also in trust for the public; and that such corporations can not lease or otherwise dispose of their franchises needful in the performance of their public duties, without legislative consent. *Stockton* v. *Central Railroad*, 24 Atl. Rep. 964.

In a case in Illinois decided in 1887, the court held that reason and the weight of authority were in favor of the doctrine that a corporation has no right to sell or lease its franchise, or any property essential to its exercise, which it has acquired under the law of eminent domain, without legislative authority. *Fietsam* v. *Hay*, 122 Ill. 293 ; 3 Am. St. Rep. 492.

In another case, decided in 1889, a corporation for the manufacture and sale of gas, having a capital of $25,000,000, had obtained by purchase a controlling interest in four other gas companies, having an aggregate capital of nearly $17,000,000 ; and in the vigorous language of the court, was thus able to destroy the energies of all other corporations of the same kind, and suck the life-blood out of them ; and the court held that such a combination could not be tolerated ; that the business of manufacturing and distributing illuminating gas by means of pipes laid in the public streets of a city, is a business of a public character ; that it is the exercise of a franchise belonging to the State ; that the services to be rendered for such a grant are of a public nature ; and that any unreasonable restraint upon the performance of such duties is prejudicial to the public interests, and in contravention of public policy, and could not be allowed. *People* v. *Chicago Gas Trust Co.* 130 Illinois, 286 ; 17 Am. St. Rep. 319.

Equally vigorous is the language of the New York Court of Appeals. In a case relating to the combination known as the Sugar Trust,—a trust that included the Forest City Sugar Refining Company of this State, and so successfully sucked its life-blood out of it that its machinery has since remained as silent as a city of the dead,—the court said that corporate grants are always assumed to have been made for the public benefit, and that any conduct which destroys their normal functions, and maims and cripples their separate activity, must affect unfavorably the public interest ; and that this is so to a much greater extent when a combination includes and dominates an entire industry, and puts upon the market a capital stock proudly defiant of actual values, and capable of an unlimited expansion ; that it is not a sufficient answer to say that similar results may

be lawfully accomplished by an individual having the necessary wealth, for it is one thing for the State to respect the freedom of the citizen, and quite another thing to create artificial persons to aid in promoting such aggregations; that the individuals are few who hold such enormous wealth; but if corporations can combine and mass their forces, a tempting and easy road is opened to enormous combinations, vastly exceeding in strength, and in power over industry, any possibilities of individual ownership. *People* v. *Sugar Refining Company*, 121 N. Y. 582 (18 Am. St. Rep. 843).

The law does not assume that all combinations of corporate powers and franchises are necessarily hurtful. It recognizes the fact that they are sometimes beneficial, and provides a way by which they may be lawfully made. But as such combinations are liable to be made for improper purposes and with conditions annexed to them which are inadmissible, sound public policy requires that they be made under legislative supervision and restraint.

In the present case, the Brunswick Gas Light Company undertook to lease all its property, and all its corporate rights and privileges, to the United Gas, Fuel, and Light Company, for twenty-five years. The latter company took possession of the works and held them for seventeen and a half months, making improvements upon them and paying a portion of the agreed rent. It then abandoned the works, and possession was resumed by the lessors.

This is a suit by the lessors against the lessees for a breach of the covenants contained in the lease. It was contended in defense that the lease was illegal and void and that no recovery could be had upon it. The presiding justice ruled, as a matter of law, that the plaintiff company and the defendant company had power to execute the lease, and that a recovery could be had for a breach of the covenants contained in it. We think the ruling was erroneous. No legislative authority for making the lease was shown, and, without such authority, we think the lease must be regarded as *ultra vires* and void. The authorities bearing upon the question are not in

entire harmony; but the weight of authority seems to us to be overwhelmingly in favor of this conclusion.   See 2 Beach on Corporations, sections 831 to 856 inclusive, and the six pages of authorities, *pro* and *con*, cited under the section last cited. The cases are too numerous for citation here, and the few cases to which we have referred will furnish a key to all of them.

But it is claimed that, inasmuch as the defendant company took and held possession of the plaintiff company's works by virtue of the lease, *ultra vires* is no defense to an action to recover the agreed rent.   We do not doubt that the plaintiff company is entitled to recover a reasonable rent for the time the defendant company actually occupied the works; but do not think the amount can be measured by the *ultra vires* agreement.   We think that in such cases the recovery must be had upon an implied agreement to pay a reasonable rent; and that while the *ultra vires* agreement may be used as evidence, in the nature of an admission, of what is a reasonable rent, it can not be allowed to govern or control the amount.   It seems to us that it would be absurd to hold that the *ultra vires* lease is void and at the same time hold that it governs the rights of the parties with respect to the amount of rent to be recovered.   A void instrument governs nothing.   We think the correct rule is the one stated by Mr. Justice Gray, in a recent case in the United States Supreme Court.   He said that a contract made by a corporation which is unlawful and void, because beyond the scope of its corporate powers, does not by being carried into execution become lawful and valid; and that the proper remedy of the aggrieved party is to disaffirm the contract and sue to recover as on a *quantum meruit* the value of what the defendant has actually received the benefit of.   *Pittsburgh, etc.* v. *Keokuk, etc.* 131 U. S. 371.   We think this is the correct rule.   2 Beach on Corp. § 423, and cases there cited.

*Exceptions sustained,*

PETERS, C. J., EMERY, FOSTER and HASKELL, JJ., concurred.