[No. 9417.  *En Banc.*  September 14, 1911.]

PUGET SOUND ELECTRIC RAILWAY, *Appellant*, v. RAILROAD
COMMISSION OF WASHINGTON *et al., Respondents,*
DAVID HART *et al., Interveners.*[1]

CARRIERS—REGULATION OF RATES—DETERMINATION — REPLACEMENT
FUND.  In fixing reasonable rates for an interurban railroad, there
should be allowed an annual renewal fund upon which to draw for
necessary replacement; but, where the company has failed to pro-
vide the same for a number of years, it cannot ask that the traffic
for any future year or years shall bear all the deterioration of past
years.

SAME—REASONABLE PROFIT—VALUE OF SERVICE.  The right of a
carrier to fix rates which will earn a fair return on its investment
is qualified by the rule that it cannot exact rates higher than the
service is reasonably worth. or more than the traffic will bear.

SAME—RATES — REASONABLENESS — EVIDENCE TO SUSTAIN REDUC-
TION.  Where an interurban railroad had been charging rates that
did not net an adequate return on its investment, and advanced all
rates to such an extent that new rates within the ten-mile zones of
the terminal cities, and a few other points, approximating 10 per
cent of the schedule and 25 per cent of the revenue from passenger
traffic, were more than such traffic would bear, an order of the rail-
road commission is justified restoring the old rates within those
zones, where that was all the patrons could afford to pay, and such
reduced service was not rendered at a loss, and with increases at
other points will produce a revenue of 7 per cent on its investment.

SAME—DISCRIMINATION.  The reduction of rates as to ten per cent
of the passengers carried by an interurban road to a figure that will
give a profit on the actual cost of that part of the haul, although
not an adequate return upon the investment, is justified where the
company thereby earns a revenue that it could not otherwise obtain
and its profits on its other business is not affected and when the
same is all that such patrons can afford to pay for the service; and
such a rate is not unjust discrimination against persons and places.

SAME — REASONABLE RETURN ON INVESTMENT—EVIDENCE—SUFFI-
CIENCY.  Seven per cent upon the investment of an interurban rail-
road is shown to be a reasonable profit where it appears that the
company had loaned over two million dollars at six per cent to an
allied corporation doing business in the same locality with approxi-
mately the same attendant risk as the interurban company.

[1]Reported in 117 Pac. 739.

SAME—REGULATION OF RATES—PROCEEDINGS OF COMMISSIONS—AP-
PEAL—REVIEW OF FINDINGS.  The findings of a railroad commission
upon the reasonableness of railroad rates, the determination of
which calls for the exercise of economic as well as legal principles,
should not be disturbed on appeal to the courts, unless it appears
that they were made arbitrarily and without a full and due consider-
ation of the facts.

SAME—DISCRIMINATION—COMPETING LINES.  It is not unjust dis-
crimination to reduce the rates of an interurban railroad below the
amounts charged by steam railroads touching certain points, where
the railroads are not seeking to handle that class of traffic and have
not the facilities or the time schedules to make them in reality com-
peting lines.

Appeal from a judgment of the superior court for Thurs-
ton county, Mitchell, J., entered November 22, 1910, upon
sustaining orders of the railroad commission establishing a
schedule of passenger rates upon appellant's railway lines,
after a hearing before the court.  Affirmed.

*Benjamin S. Grosscup* (*James B. Howe, William Carr
Morrow*, and *John A. Shackleford*, of counsel), for appellant.

*The Attorney General*, for respondents.

MORRIS, J.—This appeal brings up for review the order
of the railroad commission of Washington, establishing a
schedule of passenger rates on the lines of appellant between
Seattle, Tacoma, Puyallup, and Renton.  The evidence is
voluminous, and the commission has made many findings re-
lating to every detail considered by it in arriving at its con-
clusion.  These findings are in the main conceded to be cor-
rect by appellant, as it attacks only three of them, upon
which it contends the commission based its estimate of future
earnings, operating expenses, depreciation, taxes, and other
items taken into consideration in arriving at its conclusion
that 7 per cent is a reasonable return to appellant upon its
investment.  The errors alleged in the making of the final
order are, that it does not permit appellant to earn a rea-
sonable return on the value of its property; that it imposes

a burden of carrying passengers between Seattle and points within ten miles of Seattle, and between Tacoma and points within ten miles of Tacoma, at a rate less than the cost of the service; that it fixes a rate less than competing steam railroads charge for the same service; and that it violates the constitution of the state prohibiting discrimination in rates between persons and places. It will be difficult to make a proper statement of all the facts entering into the questions submitted by this appeal and keep this opinion within proper bounds. We will, therefore, not attempt to make a detailed statement of all of such facts, but will refer only to such as may be necessary to give a proper understanding of the points involved.

Appellant opened its line for passenger traffic between Seattle, Tacoma, and intermediate points, in the fall of 1902, and published a schedule of rates which remained in force until October 17, 1909, when a new schedule was announced and put in operation, making material advances in the rates. Thereupon W. H. Paulhamus filed a petition with the commission, alleging that the new rates thus established were unfair, unreasonable, and exorbitant, and praying for a hearing. This proceeding is known as cause No. 76, in the records of the commission, and coupled with it on the hearing, and in the subsequent proceedings before the superior court of Thurston county, is cause No. 74, in the records of the commission, involving the valuation of appellant. Appeals were taken from the final orders made by the commission in these proceedings, to the superior court of Thurston county, which court in all things sustained the commission; and a subsequent appeal brings both proceedings here, where, as in the court below, they will be treated as one. It will not be necessary to make any reference to the complaint in intervention, as no new or additional questions are thereby submitted.

In 1902, when the railway went into operation, the only

town within ten miles of Seattle was Georgetown, then having a population of approximately 250. Next south was Kent, some seventeen miles, with a population of 755. Between that time and the going into effect of the increased rates in October, 1909, the population had increased along the line of the railway, within the ten-mile zone tributary to Seattle, by the establishment of new towns with their tributary inhabitants as follows: Meadows, 500; Quarry, 500; Duwamish, 500; Allentown, 500; Riverton, 450; Foster, 900; Tukwila, 600; Earlington, 500; while Georgetown had increased to 7,000. These figures are given by the commission as an approximation only of the number of inhabitants tributary to each of these points, as at the time of the findings the census of 1910 had not been made public. They will, however, be accepted as substantially correct. The same situation was developed along the southern end of the line tributary to Tacoma, where a number of small towns, ranging from a few inhabitants to 700 or 800, had grown up along the line. These points the undisputed evidence shows to be inhabited by clerks, laborers, and small wage-earners, who had purchased homes on the installment plan, attracted by the cheapness of the land and the rate of fares charged between them and Seattle and Tacoma, by which they were enabled to reach their respective places of labor in those cities almost as quickly and as cheaply as if living within the cities themselves.

Under the old rates the stations south from Seattle to Tukwila, ranging in distance between 3.22 and 9.85 miles, were given a one-way rate of 10 cents and a return rate of 15 cents; while under the new rate an increase was exacted of, in some instances, as high as 250 per cent; the return rate at the Seattle end being advanced as follows: Davis, to 24 cents; Meadows and Southside, to 26 cents; Floraville, to 28 cents; Cardmoores, to 28 cents; Duwamish, to 30 cents; Quarry, to 32 cents; Allentown, to 34 cents; Riverton, to 34 cents; Mortimer, to 36 cents; Foster, to 38 cents, and Tuk-

wila, to 40 cents. ˙ A like advance was made at the Tacoma
end.   The effect of these advances was to compel many of
the people at these points who labored in the cities to abandon
their homes and move into the city; the evidence being con-
clusive that the rates were prohibitive; and, if continued, it
would mean a sacrifice and abandonment of the home in favor
of cheaper transportation.   It is also shown that, under the
old rates, in the Tukwila zone the morning trains into Seattle
and the evening trains out were crowded to their capacity;
while under the new rate travel had fallen off to less than
half.   The same condition is shown within the zone tributary
to Tacoma.   Other changes were:  Seattle to Kent increased
from 30 cents to 34 cents one way, while the round trip rate
was increased from 50 cents to 68 cents; Seattle to Tacoma,
single trip increased from 60 to 73 cents, round trip from $1
to $1.25.   This through business is shown by the evidence to
constitute nearly 57 per cent of the passenger traffic.

No contention is made upon the Seattle-Tacoma rate, as
it was not interfered with by the commission.   From Kent to
Tacoma the rate was increased from 30 cents to 39 cents one
way, and round trip from 60 cents to 75 cents; Seattle to
Renton increased from 15 cents to 27 cents, round trip from
25 cents to 54 cents.   These instances will serve as an illus-
tration of the character of the increase of the new rate sched-
ule over the old.   The order of the commission as to these
rates was to restore the old round trip rate between Seattle
and points south, as far as Renton Junction, a distance of
eleven miles; and from Tacoma north to Algona, a distance
of twelve and one-half miles.   The old rate was also restored
between Tacoma and points on the Puyallup line.   The round
trip rate from Seattle to Renton was reduced from 54 cents
to 35 cents; from Seattle to Earlington from 50 cents to 30
cents.   The single fare between Kent and Seattle and Kent
and Tacoma was allowed to stand, but the round trip from
Kent to Seattle was reduced from 68 cents to 53 cents, and

from Kent to Tacoma from 78 cents to 75 cents. The effect on the schedule as a whole by the commissioners' order was to permit the increase of the new rate on 76.66 per cent of the total passenger revenue derived by the railway, which amounts approximately to a increase of nearly 25 per cent of the old rates.

The effect of these increased rates in the suburban zones tributary to Seattle and Tacoma is further shown by the result in the sales of tickets. Ticket sales at the Seattle office for travel between Seattle and Foster averaged between June 30 and October 16, 1909, under the old rate, $543.34 per month; while between October 17 and January 1, 1910, under the new rate, sales decreased to an average of $66.73. For the same time between Seattle and Riverton, under the old rate, an average of $629.45 per month, and under the new rate $80.35 per month; between Seattle and Duwamish, under the old rate, sales averaged $191.25 per month, under the new rate $38.12; between Seattle and Pacific City during the same period, under old rate, $355.34; under new rate $130.30; between Seattle and Tukwila, same period, old rate $345.91, new rate $38.96; while sales at the Kent office for the same period dropped from $3,664.35 per month to $1,460. Approximately 80 per cent of the gross earnings of the company is derived from passenger traffic. These gross earnings for the six years the railway had been in operation prior to the hearing are:

| 1903 | $354,990.67 |
| 1904 | 430,732.84 |
| 1905 | 450,632.32 |
| 1906 | 574,962.06 |
| 1907 | 708,548.78 |
| 1908 | 721,542.85; |

and for the year 1909 it was estimated the amount would be $755,552.17.

The market value of the railway's property was found to

be $4,070,237, and the net earnings from its operation since
its organization, upon the money invested, was found to be:

For the year ending June 30, 1903 . . . . . 5.15 per cent.

"    "    "    "    ."    "    1904 . . . . . 5.25   "    "

"    "    "    "    "    "    1905 . . . . . 5.18   "  ,  "

"    "    "    "    "    "    1906 . . . . . 7.79   "    "

"    "    "    "    "    "    1907 . . . . . 9.92   "    "

.  "    "    "    "    "    "    1908 . . . . . 7.60   "    "

"    "    "    "    "    "    1909 . . . . . 5.74   "    "

The depreciation for the same period was found to be ap-
proximately $500,000. No replacement fund had been pro-
vided to take care of this depreciation, except an expendi-
ture of approximately $51,000 since 1906, in actual replace-
ments, which replacements have in each instance been charged
to operating expenses. Assuming the same volume of business
to continue, and adopting the gross earnings from freight
and passengers for the year 1909 at $648,547.75, as shown
by the report of that year, the commission found that 25 per
cent of these gross earnings, or $162,136.94, should be
charged to operating expenses to cover depreciation and re-
placement. This item is attacked by appellant, it claiming
that it should be allowed at least $180,000 for this item.

We have carefully and with painstaking attention gone
over the evidence submitted upon this point, and as a result
we are satisfied that, after making all proper allowances to
reach an estimate of this character, the amount found by the
commission is as nearly correct as it is possible to determine.
Appellant contends in this connection that the commission
has entirely lost sight of the fact that, during the next few
years, money will be required for renewals in excess of the
average annual revenue, occasioned by the fact that the rail-
way has heretofore been unable from its revenues to set aside
an annual renewal fund upon which it can then draw for nec-
essary replacement. It is unquestionably true that the rail-
way company is not bound to see its property gradually de-
teriorate in value and earning power, without making pro-

vision out of its earnings to keep its usefulness unimpaired; and that it can properly charge an annual sum to care for necessary depreciation and waste, and have such sum allowed in any determination of what is a proper return upon its investment to be approximated in fixing its rates of carriage. But we cannot concede that, in so doing, it can make the traffic of any future year or years bear all the burdens of the deterioration of past years. Each year should carry the burden of its own wear and tear, and thus, when renewals become necessary, the burden is equally borne by all contributing features. As we read it, the supreme court of the United States has so held in *Knoxville v. Knoxville Water Co.,* 212 U. S. 1, where, at page 14 of its opinion, in treating a like question, it is said:

"If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon over-issues of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past."

Accepting, therefore, the contention of appellant, that it is shown that from $140,000 to $160,000 will be required annually for the next three to five years for renewals and replacement, such an expenditure will not be made necessary by the deterioration and waste of these years alone; but the conditions necessitating renewals and replacement are the result of the years of wear and tear that have gradually taken place since the operation of the road first began, and each year contributing to such a condition should be charged with its proportionate share of the burden. That 25 per cent of the earnings is a sufficient sum to be set aside each year as a depreciation and renewal fund is clearly established by the testimony; and had this sum been so set apart each year, there

can be little doubt but that the company would now have on hand a sufficient amount to care for all its present and future needs properly chargeable to such fund. While the question is more of an economic than a legal one, and hence difficult of determination in a judicial inquiry, we are satisfied that no injustice has been done appellant in this finding.

The next contention is that the passenger rates fixed by the commission within the ten-mile zones of Seattle and Tacoma are unreasonable, and the limit of 7 per cent as a proper return on the investment is too low. Rate making is a study in itself and presents a difficult problem, even to those who have spent years of application in its solution. Considered both as an economic and a legal question, certain principles have been worked out as forming the proper rules for its determination. A railway company, while organized as other corporations as a profitable investment for its stockholders, by reason of its being a common carrier, assumes certain obligations to the public. Among these is to devote its property to the use of the public; and when property is so used, it ceases to be *juris privati* only, but becomes affected with a public interest.

"Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." *Munn v. Illinois*, 94 U. S. 113.

Railways and other public service corporations are created upon the hypothesis that they will be a public benefit. The state confers upon them special and extraordinary privileges. It exacts from them in return the performance of public duties, and that they hold their property in trust, not only for the pecuniary benefit of their stockholders, but for the public

use as well. *Stockton v. Central R. Co.*, 50 N. J. Eq. 52, 24 Atl. 964, 17 L. R. A. 97; *Brunswick Gas Light Co. v. United Gas, Fuel & Light Co.*, 85 Me. 532, 27 Atl. 525, 35 Am. St. 385. Hence, in determining the reasonableness of railway rates, consideration must be given, not only to the carrier, but to the individual requiring the service. The carrier is entitled to adequate recompense for the service it performs. The individual is entitled to a rate that he can reasonably afford to pay for the service he requires. Upon this point, both judicial and economic authority agree.

"It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public." *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U. S. 578.

A railroad is a public highway, created for public purposes. Such a corporation, although it owns the property it employs in the public service, must be held to have accepted its rights and privileges subject to the condition that the individual or the public whom it serves may be protected against unreasonable charges. The corporation may not be required to use its property for the benefit of the public without just compensation for the service it renders. Neither may it fix such a rate as will best suit its own interests, without regard to the rights of the public.

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public . . . What the company is entitled

to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services required by it are reasonably worth." *Smyth v. Ames*, 169 U. S. 466, 546.

The right of the company on the one hand to derive a fair income from its investment, and the right of the public on the other hand to have no more exacted than the services in themselves are worth, is announced in all the Federal cases having to do with questions of this character. *Texas & Pac. R. Co. v. Interstate Commerce Commission*, 162 U. S. 197; *Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 362; *Cotting v. Kansas City Stock Yards Co.*, 183 U. S. 79; *Minneapolis & St. Louis R. Co. v. Minnesota*, 186 U. S. 257; *Covington & Lexington Turnpike Road Co. v. Sandford, supra; San Diego Land & Town Co. v. Jasper*, 189 U. S. 439; *Stanislaus County v. San Joaquin etc. Canal & Irr. Co.*, 192 U. S. 201; *Southern Pac. Co. v. Bartine*, 170 Fed. 725; *Interstate Commerce Commission v. Louisville & N. R. Co.*, 73 Fed. 409. The same rule has been announced in the state courts. In *Kennebec Water District v. Waterville*, 97 Me. 185, 202, 54 Atl. 6, in dealing with the question of the reasonableness of the rate to be charged consumers of water, the court, in announcing the principle that the right of the water company to a fair return on its investment is coupled with the right of the consumer to have no more exacted than the service is worth to him, says:

"Yet while the company is entitled, so far as this case shows, to a fair return upon the value of the property used for the public at the time it is being used, the public, that is the consumers, may demand that the rates shall be no higher than the services are worth to them, not in the aggregate, but as individuals. The value of the services in themselves is to be considered, and not exceeded. These views seem to be consonant with reason. They are also established by the highest judicial authority in our country."

The same court had occasion later to examine into the same question, in *Brunswick & T. Water District v. Maine Water Co.*, 99 Me. 371, 59 Atl. 537, and in affirming the doctrine of the cited case, it says:

"Reasonableness relates to both the company and the customer. Rates must be reasonable to both, and if they cannot be to both, they must be to the customer. . . A public service company cannot lawfully charge in any event more than the services are reasonably worth to the public as individuals, even if charges so limited would fail to produce a fair return to the company upon the value of its property or investment. . . . The company engages in a voluntary enterprise. It is not compelled, at the outset, to enter into the undertaking. It must enter, if at all, subject to the contingencies of the business, and subject to the rule that its rates must not exceed the value of the services rendered to its customers. It has accepted valuable franchises granted by the state, franchises ordinarily exclusive for the time being, franchises which ordinarily debar the public from serving themselves satisfactorily in any other way,—and in return it must perform the duties to the public which it has voluntarily assumed, at rates not exceeding the value of the services to the public, taken as individuals; and this irrespective of the remuneration it may itself receive."

The same rule is announced by the interstate commerce commission in cases within its jurisdiction. *Imperial Coal Co. v. Pittsburgh & Lake Erie R. Co.*, 2 Interstate Commerce Comm. 618, 636, where it is said:

"The value of the service is generally regarded as the most important factor in fixing rates."

And in *Thurber v. New York Cent. & H. R. R. Co.*, 3 Interstate Commerce Comm. 473:

"As was said in the second annual report, the commission has laid down the principle that carriers in making rates cannot arrange them from an exclusive regard to their own interest, but that they must respect the interests of those who may have occasion to employ their services, and subordinate their own interests to the rules of relative equality and justice."

Without referring to them specifically, it may be said that all the recognized economic authorities who have taken up the subject of rate making, such as Noyes' American Railroad Notes, Johnson's American Railway Transportation, Ripley's Railroad Problems, Beal & Wyman on Railroad Rate Regulation, and others cited in the briefs, lay down the same general rules. From these authorities, the true rules can be gathered, that rates can go no higher than the service is reasonably worth to the public requiring the service; and that the reasonable value of the service to the public may be insisted upon, even though charges so limited would fail to produce a fair return to the carrier upon its investment. Such a rule, as applied to these great public service corporations, is based upon reason and justice, because of their exercise of governmental powers and assumption of the functions of the state in their acquisition of their property, compelling the individual to yield and surrender his own that it may be devoted to the greater service of the general public; benefits that cannot be enjoyed without corresponding burdens. If they seek to exercise the function of the state in one particular, they cannot deny it in another. If they can take property from the individual because it is to be devoted to a public use, then they must recognize such public use as the first law affecting such property, and subordinate the interests of stockholders to the interest of the public, irrespective of the effect upon the question of profits. In this respect they differ from other corporations in whose property there is only an incidental public use. This distinction is pointed out in *Cotting v. Kansas City Stock Yards*, 183 U. S. 79, in this language:

"Now, in the light of these decisions and facts, it is insisted that the same rule as to the limit of judicial interference must apply in cases in which a public service is distinctly intended and rendered and in those in which without any intent of public service the owners have placed their property in such a position that the public has an interest in its use. Ob-

viously there is a difference in the conditions of these cases. In the one the owner has intentionally devoted his property to the discharge of a public service. In the other he has placed his property in such a position that, willingly or unwillingly, the public has acquired an interest in its use. In the one, he deliberately undertakes to do that which is a proper work for the state. In the other, in pursuit of merely private gain, he has placed his property in such a position that the public has become interested in its use. In the one it may be said that he voluntarily accepts all the conditions of public service which attach to like service performed by the state itself. In the other that he submits to only those necessary interferences and regulations which the public interests require. In the one he expresses his willingness to do the work of the state, aware that the state in the discharge of its public duties is not guided solely by a question of profit. It may rightfully determine that the particular service is of such importance to the public that it may be conducted at a pecuniary loss, having in view a larger general interest. At any rate, it does not perform its services with the single idea of profit. Its thought is the general public welfare. If in such a case an individual is willing to undertake the work of the state, may it not be urged that he in a measure subjects himself to the same rules of action, and that if the body which expresses the judgment of the state believes that the particular services should be rendered without profit he is not at liberty to complain? While we have said again and again that one volunteering to do such services cannot be compelled to expose his property to confiscation, that he cannot be compelled to submit its use to such rates as do not pay the expenses of the work, and therefore create a constantly increasing debt which ultimately works its appropriation, still is there not force in the suggestion that as the state may do the work without profit, if he voluntarily undertakes to act for the state he must submit to a like determination as to the paramount interests of the public? Again, wherever a purely public use is contemplated, the state may, and generally does, bestow upon the party intending such use some of its governmental powers. It grants the right of eminent domain by which property can be taken, and taken not at the price fixed by the owner, but at the market value. It thus enables him to

exercise the powers of the state, and exercising those powers and doing the work of the state is it wholly unfair to rule that he must submit to the same conditions which the state may place upon its own exercise of the same powers and the doing of the same work?"

It is conceded that the rates originally adopted by the company did not net an adequate return on its property. The commission, therefore, having in mind the establishment of such rates as would produce what it deemed to be an adequate return, by its order permitted approximately 90 per cent of the new rate to remain, affecting 75 per cent of the revenue derived from passenger traffic; the restoration of the old rates within the ten-mile zones and at Kent, Renton, and a few other points, approximating only 10 per cent of the revenue and 25 per cent of the passenger traffic. That in so doing it had in mind the establishment of a rate the patrons of the railway at the points affected could afford to pay, and one which, considering all controlling features, would be reasonable to both the company and the public, is demonstrated to our mind by the findings, to which no exceptions are taken. The rate established at those points is one which the patron can pay. It is one which we believe will give the company a profit over the cost of the particular service, and which, when added to the charges permitted to remain, will produce a revenue of 7 per cent which, considering the character of the services and the rights of the public, we cannot say is either unreasonable or unjust.

We have heretofore referred to some of the facts found by the commission affecting orders as applied to these suburban zones. A better and more extended statement of these facts will be disclosed in the 3d, 4th and 5th findings of the commission, which relate solely to the conditions disclosed by the evidence in the suburban zones. To these findings we find no exceptions.

"Finding No. 3.

"That the following points are suburban to Seattle, viz., Georgetown, Colvins, McLeans, Gorgiats, Marinos, Maples,

Burts, Mackays, Van Asselts, Chicago Avenue, Davis, Meadows, Sunnyside, Floraville, Cardmoores, Duwamish, Quarry, Allentown, Riverton, Mortimer, Foster, Tukwila, Black River, and Renton Junction. That practically 90 per cent of the heads of families living in said suburban towns gain their livelihood in Seattle as clerks, laborers and mechanics; that the clerks travel to and from such points to Seattle practically six days in the week, laborers traveling on the average of four round trips per week; that such heads of families either own their homes in such suburban towns or are paying for the same on the installment plan. That they were induced to purchase such homes by reason of the rate charged for the round trip and its long continued enforcement. That under the rates charged prior to October 17th, 1909, the return trip as far south as Tukwila being not in excess of 15 cents, or but 7 cents in excess of the street car fare in Seattle, residents, laborers, clerks and others employed in Seattle were able, by reason of obtaining cheaper homes at such points then adjacent to street car lines in Seattle, to pay such additional 7-cent car fare. That under the increased rate to such suburban towns, the residents, laborers and clerks are unable from their salaries to pay such increased rate, by reason of its being cheaper to rent homes adjacent to such street car lines than occupy their homes and pay such increased rates, and many families and residents of such places, to wit, 20 from Quarry, Duwamish and Allentown, 12 from Tukwila, 18 from Foster, and more or less from all towns mentioned as suburban, have already abandoned their homes and moved to points adjacent to street car lines in Seattle, and many others are contemplating moving if relief be not granted in this hearing, all by reason of such increased rates and fares. That the following points are suburban to Tacoma: Waverly, Tidehaven, Brookville, Meeker, Puyallup, Berrytown, Cedarhurst, Firwood, Ardena, McAleer, Willow Junction, Cushman, Fife, Milton, Edgewood, Jovita, Bluffs, Pacific City and Algona, and a large part of the heads of families, residents of such towns, earn their livelihood working as clerks, laborers and mechanics in Tacoma, and a similar condition exists as to such towns suburban to Tacoma as that hereinbefore set out as to the points suburban to Seattle, and many are leaving their homes and moving to Tacoma for the same reasons as above set out."

### "Finding No. 4.

"That the town of Renton is served by the Seattle, Renton & Southern Railway, an electric line extending from Seattle to Renton.   That the rates now charged and heretofore in force by said last named company is the rate charged by the defendant prior to the 17th day of October, 1909; namely, 15 cents for the single trip and 25 cents for the round trip. That for the year ending June 30th, 1909, the average earnings from passengers going between Seattle and Renton, as indicated by the sales of tickets at the different ticket offices, amounted to the sum of $17,254.10, or an average of $1,438.00 per month; that between June 30th, 1909, and the 16th day of October, 1909, said sales had increased to an average of $2,708 per month, and between the 17th day of October, 1909, and the 1st day of January, 1910, while the said increased rates were in force, said passenger earnings decreased to $302.00 per month, as shown by the sales at the said ticket offices.   That the return fare being twice the single fare, during said last mentioned time a greater number of people traveling over said line would be likely to pay cash fare to the conductor on the train; such cash fares not having been segregated and accounts taken thereof other than cash fares collected by the conductors, the commission is unable to state the percentage collected by the conductors as cash fare, but that between the 16th day of October, 1909, and the 1st day of January, 1910, the earnings of the Seattle, Renton & Southern Railway [a competing line] from passenger business between Renton and Seattle increased more than 150 per cent. That Earlington is situate between Renton Junction and Renton, and there is in the vicinity of Earlington tributary to the defendant company's lines approximately 500 people; that a large number, to wit, 90 per cent of the heads of families residents of and in the vicinity of Earlington, earn their livelihood in Seattle as laborers and clerks, and that a similar condition exists as to the residents of Earlington as has been heretofore pointed out as to other suburban points. That in addition to the facts hereinbefore set out, the residents of Earlington and vicinity, in order to reach their place of business in Seattle, walk from the vicinity of the station an additional mile and a half in order to obtain the cheap fares charged by the Seattle, Renton & Southern."

"Finding No. 5.

"That the town of Puyallup was and is served by the defendant line and by the Tacoma Railway & Power Company, an allied corporation, such last named line running from Fern Hill over an adverse grade, traveling a distance of approximately 16 miles to Tacoma, the defendant company's line via. Willow Junction being 9.94 miles to Tacoma, and being over a much easier grade and through a more fertile and populous district than the Tacoma Railway & Power Company's line. That in the year 1908, when the defendant company was seeking a franchise from the city of Puyallup to lay its lines in the streets of Puyallup, the town, through members of its council, contemplated and suggested inserting a provision in the franchise limiting the rates thereafter to be charged between Puyallup and Tacoma to a rate not exceeding the rates then and theretofore charged over the line of the Tacoma Railway & Power Company; namely, 15 cents for a single trip and 25 cents for the round trip; that at such time the manager of the defendant company objected to the insertion of the provision, giving as a reason therefor that it would be an obstacle to the floating of the securities, and at such time indirectly promised that should such franchise be granted, the rates in the future would not exceed the rates charged by the Tacoma, Railway & Power Company as before stated, and by reason thereof and relying thereon, the provision was waived by the town council of Puyallup, and such provision was not inserted in the franchise. That Puyallup is suburban to Tacoma, many persons living in Puyallup dependent for their livelihood on employment in Tacoma as laborers, clerks and mechanics, and similar conditions exist as to such residents as have heretofore been set out as existing in other suburban towns."

That the rates fixed in these suburban zones is one which will permit the company to accept the business at a profit over the cost of operating expenses, is to our mind established by the evidence. The greatest distance affected by the reduction in the suburban zones is 9.85 miles, from Seattle to Tukwila. Between these points the commission reestablished the old rate of 15 cents for the round trip, making approximately a rate of 76-100 of a cent per mile. Appellant's

exhibit W, a table showing the expense of operation for 1908 and 1909, gives the average cost of moving a passenger a mile in 1908 as .00904 of a cent; in 1909 as .00864 of a cent. Mr. Birtwell, who prepared the table for the company, testified that these figures included all operating expenses and everything that could be so charged except taxes. He then testified that the moving cost would approximate only about 9-16 of this expense, so that the actual moving cost per passenger per mile in 1908 would be approximately .00482 of a cent; in 1909 .00508 of a cent. As the distance decreases, the profit would increase; so that the result reached is the greatest cost to the company in these suburban zones. The commission figures this cost still lower, and fixes .00582 of a cent as the cost to appellant of carrying each passenger a mile, by using what it contends is the proper rule to reach such a result. We have taken exhibit W, however, in order to reach the greatest cost contended for by the company. We have, then, this situation; the carrying of 25 per cent of the total number of passengers carried by the company under rates affecting only 10 per cent of the passenger revenue at a rate less than what would be an adequate return to the company for the use of its property, but a rate which affords the company a profit over the actual cost of moving the passenger, and the only rate the passenger can afford to pay. Taking all things into consideration, we believe such a rate as meets the above conditions is a reasonable rate, both to the company and to the public.

President Hadley of Yale deals with this situation in his "Railroad Transportation," saying:

"A great deal of freight of small value is carried, not merely at less than the average rates, but at less than the average cost; that is, at rates which, if applied to the whole business of the road, would not pay expenses. Many people assume that such business is an actual loss to the road and that other business is taxed to make up for it. This is a fallacy. Any rate which will more than cover the expense of

moving the cars and handling the goods is a paying rate, providing the business can be had on no other terms."

The view of such an eminent authority is interesting and instructive upon any question of economics, if it may not be received as authoritative in law.    That this reduction of rates to a figure that will give a profit on the actual cost of the haul, while not sufficient as an adequate return from an investment standpoint, is recognized as correct in principle, is illustrated by the testimony in referring to the case of the Illinois Central in handling the suburban travel out of Chicago as far south as Florsmore, a distance of 27 miles, at a rate of 24 cents, or .00888 of a cent per mile, the rate being considerably less intermediate; the justification from the railroad standpoint being the building up of the suburbs and using its tracks to their maximum capacity, by giving a rate that induces suburban residence and gives the railroad a revenue it could not otherwise obtain.    Other like instances are given.    In *Sprigg v. Baltimore & O. R. Co.*, 8 Interstate Commerce Comm. 443, we find this recognition of the same principle:

"The granting of commutation rates for suburban travel is quite general, and such rates are defensible on various grounds.    They tend to benefit the public by permitting and inducing residence at considerable distance from the place of occupation, thus aiding the territorial growth of cities and relieving their congested districts.    So far as they have that effect, such rates in turn benefit the railways by securing business that otherwise would not exist and revenue not otherwise obtainable."

Later on in the same opinion, it is said:

"We are far from saying that a carrier which has established commutation rates for suburban service—especially when residences have been fixed and business interests adjusted in reliance upon their continuance, can suddenly or otherwise withdraw those rates and exact from all its patrons the full regular rate theretofore charged the occasional traveler.    That is not our view of the law."

Appellant contends that the order of the commission, restoring the old rates in the Seattle and Tacoma suburban zones, is based upon a theory of equitable estoppel which cannot be applied to cases of this character, and cites *Southern Pac. Co. v. Interstate Commerce Commission*, 219 U. S. 433, as authority against the application of such a rule. That case does not hold against the proper application of an equitable estoppel rule, but is based upon the doctrine that no authority is vested in the interstate commerce commission to change a just and reasonable rate to an unreasonably low rate previously in force, merely upon the ground of protecting the lumber interests of the Willamette Valley from the consequences of the new rate. The facts were that, from 1898, a rate of $3.10 per ton on carload lots of green lumber had been in existence from Willamette valley points, over the Southern Pacific to San Francisco and bay points. In 1907 this rate was changed to $5 for the same service. It was sought to reestablish the old rates, and the complaint charged that the new rate was unreasonable and that, under the old rate and in reliance upon a belief that it would not be changed, large amounts of capital had been invested in the lumber industry, upon which many people were dependent in the Willamette valley, and that such industry would be destroyed and the population detrimentally affected if the new rate should be enforced. Upon the hearing, it was admitted by the complaints that the old rate was a low rate, and they confined their evidence to the issue that it should continue, in order to enable the lumber mills to continue in a prosperous business. They made no attempt to show that the new rate was unreasonable. In fact, they admitted they made no claim that it was unreasonable. The supreme court held that the power of the commission was limited to correcting unreasonable and unjust rates, and that it was manifest from the commission's order that it assumed it had the right to restore the old rate for the benefit of the lumber interests affected, even though the new rate was in itself a just and

reasonable charge for the service rendered. No such power existing in the commission, its assumption and exercise of it was unwarranted and void.

The case before us is not so circumstanced. The chief contest before the commission was the unreasonableness and unjustness of the new rate; and while, as in the Willamette valley case, the commission sought to relieve the people from a rate which affected a beneficial interest enjoyed by them under the old rate, it was not because of such effect alone that the order was made, but because of an express finding and belief, based upon abundant evidence, that the new rate in itself was unreasonable and unjust. And our affirmance of the commission's order is based, not upon any theory of equitable estoppel alone, but upon the broader ground that the new rate is unreasonable; that it is more than the service is worth to the patron; that the old rate ordered reinstated by the commission is one which the patron can afford to pay, and is all the service is reasonably worth to him; that it is one which the company can give the patron and perform the service at a profit over the cost of the haul, and hence is a reasonable rate to both the company and the patron.

Neither is the rate ordered by the commission in violation of the constitutional provision against discrimination between persons or places. It makes no discrimination against persons or classes of persons, by charging one a greater or less rate for the same service than is charged all other persons similarly situated. It is an adaptation of rates to meet certain economic and industrial conditions in certain localities, but which has a like effect upon all who are similarly situated. In order to constitute an unjust discrimination, the railway company would have to receive a greater or less rate from one person than another to whom it furnished a like service under like conditions, either directly in the charge itself, or indirectly in the allowance of a rebate or some similar scheme which would have the effect of reducing the original charge. We find no such situation here. All persons similarly sit-

uated, affected by like conditions and subject to like cir-
cumstances, are given the same rate. *Interstate Commerce
Commission v. Baltimore & C. R.*, 145 U. S. 263; *Southern
R. Co. v. Atlantic Stove Works*, 128 Ga. 207, 57 S. E. 429.

Upon the question of the proper rate to be allowed appel-
lant as an adequate return for the capital invested in its
business, it is apparent that no particular rate can be fixed
which will alike fit all cases. In *Wilcox v. Consolidated Gas
Co.*, 212 U. S. 19, it is said:

"Such compensation must depend greatly upon circum-
stances and locality; among other things, the amount of risk
in the business is a most important factor, as well as the lo-
cality where the business is conducted and the rate expected
and usually realized there upon investments of a somewhat
similar nature with regard to the risk attending them;"

and in that case the rate was fixed at 6 per cent.

The evidence in this case is not harmonious as to what
would be a proper rate. Some witnesses for the company
gave 10 per cent as a proper return. The president of the
company, a man of large financial affairs and experience in
this section of the state, testified that the prevailing rate of
interest on loans running for a long time and backed by first-
class security was 7 per cent; on ordinary commercial paper
the rate was 8 per cent. It appears in the record here that
the appellant has loaned to its allied corporation, the Tacoma
Railway & Power Company, the sum of $2,250,000, on its
promissory notes, at 6 per cent, raising the amount by an
issue of bonds. It seems to us this meets the rule announced
in the *Wilcox* case—an investment made in the same locality,
in an enterprise of a similar nature, with approximately the
same attendant risk. If appellant regards 6 per cent as a
proper return for its investment in the Tacoma Railway &
Power Company, it should be willing to accept 7 per cent as
a proper return for its investment in its own property.

The valuation of the railway company, the estimate of
future earnings, operating expenses, maintenance, depre-

4—65 WASH.

ciation, taxes, fixed and constant charges, and other results reached by the commission in determining the questions before it, are contested by the railway company. The inquiry was of such a nature as to call largely for expert testimony, and the findings made are necessarily of the same nature. In such a case great consideration should be given the findings of that body to whom the state has primarily given the right and authority to determine questions of this character. Such findings should not be disturbed unless they bear evidence of having been arbitrarily reached and without a full and due consideration of all the controlling facts. Their determination calls for the exercise of economic as well as legal principles. Courts may well review the questions submitted, in so far as they suggest the application of legal principles. In so far as they suggest the enunciation of proper economic rules, they must defer largely to those who, by study, experience, and calling, are in a better situation to determine what is and what is not a proper method of determination.

It is further contended that, between Black River Junction and Seattle, five railroads are operating, and between Tacoma and Puyallup four railroads are operating, and the order of the commission in reducing rates below the rate permitted to be charged by these roads is a further discrimination. It does not appear that these railroads are competing lines for passenger traffic, nor that they have station facilities at any of the points affected by the order of the commission in the suburban zones, except at Puyallup, Renton and Earlington. At Puyallup the competing line of the appellant is the Tacoma Railway & Power Company, which had an established rate of 25 cents for the round trip, the same as that established by the commission in its order. At Renton the competing line is the Seattle, Renton & Southern, which has an established rate of 15 cents one way, or ten tickets for $1. The travel on this line increased on the going into effect of the new rate of appellant between Renton and Seattle, from 250 to 625 passengers a day. The people of Earlington,

upon the taking effect of the new rates, walked a distance of one and a half miles to a meeting point with the Seattle, Renton & Southern, and took that line into Seattle. There is competition at no other points. So that the railroads referred to, not seeking to handle the traffic nor having facilities, nor time schedules to handle it, are not competing lines. It does not appear that these railroads, either before or after the order of the commission, have in any way sought or desired the business handled out of the suburban points by the appellant. They are not in reality competing lines, and the order of the commission has made no discrimination in their favor. It is unquestioned from the record that the people living in these suburban zones outside of Renton and Puyallup must travel on the appellant's line or virtually be deprived of direct access by railway into Seattle and Tacoma. There being no discrimination, it is needless to determine the law upon a question which has no foundation in fact.

By reference to the table set out in the fore part of this opinion, showing the percentage of net earnings of the railway company figured on the money invested since the construction, it will be seen that such earning has averaged approximately 6 2-3 per cent under the old rates, as the average ends with the fiscal year June 30, 1909, while the new rates did not go into effect until October 17, 1909. It is, therefore, apparent that, with the general increase in rates allowed by the commission, and with the patronage from through business approximately the same with the increased round trip from $1 to $1.25, the company will have no difficulty in earning the 7 per cent fixed by the commission, in whose judgment, as a proper and sufficient rate, we join.

The orders appealed from are in all things sustained and affirmed.

DUNBAR, C. J., CROW, ELLIS, FULLERTON, PARKER, and MOUNT, JJ., concur.