NORTHERN PAC. RY. CO. v. LEE et al.

GREAT NORTHERN RY. CO. v. SAME.

(District Court, W. D. Washington, S. D. September 9, 1912.)

Nos. 1,093, 1,094.

1. CARRIERS (§ 18*)—SUIT TO ENJOIN ENFORCEMENT OF RATES ESTABLISHED BY STATE—PROPER PARTIES.

In a suit by a railroad company against a state commission to enjoin the enforcement of freight rates established by it under a state statute, shippers of articles affected by such rates may properly be joined as defendants as representatives of their class on an allegation that, unless enjoined, they will attempt to enforce such rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

2. PARTIES (§ 91*)—MISJOINDER OF DEFENDANTS—PARTIES ENTITLED TO OBJECT.

The objection that defendants are not necessary or proper parties, and are improperly joined, cannot be raised by other defendants who are proper parties.

[Ed. Note.—For other cases, see Parties, Cent. Dig. § 149; Dec. Dig. § 91.*]

3. COMMERCE (§ 61*)—STATE REGULATION OF RATES—VALIDITY—AFFECTING INTERSTATE COMMERCE.

That the enforcement of intrastate freight rates established by a state commission between points within the state will make it necessary for a carrier for the protection of its business to voluntarily reduce certain of its interstate rates does not render the order of the commission invalid as affecting interstate commerce; its effect therein being indirect and merely incidental.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 81–84; Dec. Dig. § 61.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. CARRIERS (§ 12\*)—CONSTITUTIONAL LAW (§ 298\*)—STATE REGULATION OF FREIGHT RATES—VALIDITY—REASONABLENESS OF RATES.**

Freight rates established by state authority are invalid as unreasonable and confiscatory, if so low that a carrier cannot earn a fair and reasonable return on the value of the property devoted to the service, and what constitutes a fair return is a mixed question of law and fact.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 15–20; Dec. Dig. § 12;\* Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.\*]

**5. CARRIERS (§ 18\*)—SUIT TO ENJOIN ENFORCEMENT OF RATES ESTABLISHED BY STATE—PLEADING.**

In a suit by a railroad company to enjoin enforcement of an order of a state commission establishing intrastate rates on certain classes of freight only, it is not sufficient for the bill to allege that, under such order, complainant cannot earn a fair return on its entire intrastate freight business, but it must allege facts from which it can be determined whether the particular rates affected by the order are fair and reasonable in themselves.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.\*]

In Equity. Suit by the Northern Pacific Railway Company against George A. Lee, Jesse S. Jones, and Harry E. Wilson, members constituting the Public Service Commission of Washington, W. V. Tanner, Attorney General of Washington, and J. L. Carman and C. H. Hyde; also suit by the Great Northern Railway Company against said Commission and Attorney General and Fred Sylvester and George E. Sylvester. On demurrers to bills. Demurrers sustained.

Geo. T. Reid, J. W. Quick, and L. B. da Ponte, all of Tacoma, Wash., for complainant Northern Pac. Ry. Co.

W. V. Tanner and Stephen V. Carey, both of Seattle, Wash., for defendants Lee, Jones, Wilson, and Tanner.

F. V. Brown, of Seattle, Wash., for complainant Great Northern Ry. Co.

S. J. Wettrick, of Seattle, Wash., for defendants Sylvester.

CUSHMAN, District Judge. These cases are now before the court upon demurrers to the complaints. They were heard together, and will be considered and disposed of in the same way.

The bill in case No. 1,094 alleges: That complainant is operating as one system lines of railroad in the state of Washington and other states, and is engaged in state and interstate commerce. That the greater part of its business in said state is interstate; the same cars being used for both interstate and intrastate commerce. That defendants Lee, Jones, and Wilson constitute the Public Service Commission of the state of Washington. That the defendant Tanner is its Attorney General. That the defendants Hyde and Carman are intrastate shippers of the state of Washington, sued as representatives of that class of shippers.

That in February, 1912, said Commission made an order requiring complainant to cease making charges under its freight tariffs throughout the state, and thereafter to charge only lower rates

fixed in the Commission's order. That complainant has complied with the order to avoid numerous suits and the risk of large penalties, which penalties might have aggregated more than $100,000 a day.

That the rates lowered by the Commission were on freight in classes 1, 2, 3, 4, 5, A, B, C, D, and E, according to complainant's classification of freight products, and excluded "lower class, or commodity rates * * * specifically established."

That the Commission found complainant's property used as a common carrier in the state of the value of $127,250,000. This was conceded by the bill to be approximately true. The value of the property is alleged to be:

| | |
|---|---:|
| For state business | $70,648,971 00 |
| For interstate business | $56,601,029 00 |
| For state freight business | $43,480,949 00 |
| For state passenger business | $27,168,022 00 |
| For interstate freight business | $39,833,444 00 |
| For interstate passenger business | $16,767,585 00 |

That for the fiscal year ending June 30, 1911, its revenues in the state of Washington, under the old tariff, were:

| | |
|---|---:|
| From state freight business | $6,415,416 35 |
| From interstate freight business | $5,877,130 10 |
| Miscellaneous freight earnings | $ 561,050 41 |
| Intrastate proportion miscellaneous freight earnings | $ 292,806 60 |
| Interstate proportion miscellaneous freight earnings | $ 268,243 81 |
| Revenues received on account of hire of freight equipment | $ 638,379 65 |
| Intrastate proportion of same | $ 333,163 96 |
| Interstate proportion of same | $ 305,215 69 |
| Revenues from intrastate passenger business | $3,654,988 04 |
| From interstate passenger business | $2,255,824 66 |
| Miscellaneous passenger earnings | $ 867,420 50 |
| Intrastate proportion of same | $ 536,378 14 |
| Interstate proportion of the same | $ 331,042 36 |
| Rental passenger equipment | $ 336,647 69 |
| Intrastate proportion of same | $ 208,169 47 |
| Interstate proportion of same | $ 128,478 22 |
| Received from operations connected with passenger service | $ 124,500 04 |
| Intrastate proportion of same | $ 76,985 84 |
| Interstate proportion of same | $ 47,514 20 |

That for the same year the operating expenses for the state of Washington were $13,280,609.31, segregated as follows:

| | |
|---|---:|
| For carrying freight | $8,502,079 84 |
| For carrying passengers | $4,778,529 47 |
| The ton miles carried intrastate freight were | 420,662,143 |
| The ton miles interstate freight carried were | 738,963,823 |

That one ton mile, intrastate freight, costs $2\frac{1}{2}$ times as much as one ton mile interstate freight. That, therefore, of the total freight expense—

| | |
|---|---:|
| The proportion intrastate would be | $4,993,356 51 |
| The proportion interstate would be | $3,508,723 33 |

For the same period—

| | |
|---|---:|
| The intrastate passenger miles were | 128,783,847 |
| The interstate passenger miles were | 105,843,492 |

That the intrastate passenger miles cost 15 per cent. more than the interstate passenger miles. That, therefore, of the total expense for carrying passengers—

The proportion for intrastate service was..................... $2,786,838 39
The proportion for interstate service was..................... $1,991,691 08

That for said year the taxes paid were chargeable as follows, segregated on the basis of revenue:

Against intrastate freight earnings.......................... $ 442,881 65
Against interstate freight earnings......................: $ 405,729 45
Against intrastate passenger earnings....:................ $ 276,723 92
Against interstate passenger earnings...................:.... $ 170,788 72
The total earnings, as shown for intrastate freight and freight
  equipment, was.........:.............: ................... $7,041,386 91
The total expense and taxes chargeable against the same was.. $5,436,238 16
Leaving an income of....:.....................:............ $1,605,148 75

That this income only amounts to 3.692 per cent. on the part of the property. assignable to intrastate freight business.

The total intrastate passenger earnings, including rental and
  hire. of passenger equipment, were......................... $4,476,521 49
The total taxes and expenses chargeable against the same
  were ................................................. $3,063,562 31
Leaving an income for intrastate passenger business.......... $1,412,959 18

.—or a percentage on the property assignable to intrastate passenger business of 5.201 per cent.

That on. the total valuation assignable to all intrastate business, both freight and passenger, amounting to $70,648,971, the percentage of income was 4.272 per cent: That, using the same method of calculation for the fiscal year ending June 30, 1910, the income upon such valuation was 4.771 per cent. That the rates for the years 1910 and 1911 are as great as can be reasonably anticipated for the future, and constitute a less rate than capital employed similarly in the state of Washington generally receives. That the charges fixed by the Commission are much lower than the tariffs of 1910 and 1911, and that the change will cause a reduction in freight revenue of two hundred thousand dollars annually. That complainant's road "is well and judiciously located, properly equipped and built, having reference to the business of the country and that reasonably to be expected, and is well and economically operated."

The prayer of the complaint is that the order of the Commission be declared unconstitutional and void, and the rates fixed thereby unreasonable and confiscatory; that the Commissioners and Attorney General and their successors be enjoined from enforcing the provisions of the order and the rates. fixed, and that the other defendants and all other shippers be enjoined from attempting to ship under said rates or to enforce the provisions of the order; that an accounting be taken of complainant's earnings and expenses and the value of the portion of its property devoted to freight traffic in Washington; and that an ascertainment be made of the return the complainant can receive thereon under existing rates.

The bill of complaint in case No. 1,093 alleges: That complain-

ant is operating, as one system, lines of railway in the state of Washington and other states, and is engaged in state and interstate commerce. That the defendants Lee, Jones, and Wilson constitute the Public Service Commission of the state of Washington. That the defendant Tanner is its Attorney General, and that the defendants Fred Sylvester and George E. Sylvester are intrastate shippers of the state of Washington, sued as representatives of that class of shippers. That the power and duty of the Public Service Commission are defined by chapter 81, Washington Laws of 1905, as amended by chapter 226 of the Laws of 1907, as further amended by chapter 93 of the Laws of 1909, and as further amended by chapter 117 of the Laws of 1911. That by those laws it is made the Commission's duty "to supervise and regulate the operation of public carriers, including railroads in said state, * * * to prohibit charging and collection of unreasonable charges, tariffs, rates and fares and to prescribe reasonable charges, rates and fares."

That complainant's railroads were constructed and acquired at the fair and reasonable value thereof. That the same are judiciously and wisely located, and have been at all times, and now are, well, properly, and economically operated.

That, upon complaint to said Commission—made by certain commercial organizations of the cities of Tacoma and Seattle—that the rates and fares of complainant and other carriers in the state were unreasonably high, a hearing was had, and the Commission made an order on December 13, 1911, reducing the intrastate freight rate. That another such order was made February 5, 1912.

That complainant has ever since complied with these orders. That the law of the state of Washington provides that each violation of these orders constitutes a separate offense, punishable by a fine of $1,000.

That the orders were made capriciously and arbitrarily, contrary to the evidence and without regard to complainant's right to earn a fair return on its property devoted to the public use. That the rates are confiscatory and will deprive complainant of its property, without due process of law, in violation of the fourteenth amendment to the Constitution of the United States.

That complainant's outstanding bonded debt amounts to..... $143,831,909 09
That complainant's paid-up capital stock amounts to........ $209,981,875 00

That said capitalization is fair and reasonable, and represents less than the actual value of its property.

That in the state of Washington it owns 875 miles of railroad. That therein it operates, as owner or otherwise, 1,080 miles.

That the Commission, in 1909, found complainant's property
in the state to be of the fair market value of.............. $59,577,212 00
That thereafter, in 1910, it found such property to be worth.. $67,000,000 00

That complainant has ever since been taxed by the state authorities on these values.

That the value of its property devoted to its business as a common

199 F.—40

carrier in the state of Washington, including its rights and franchises, is in excess of $67,000,000. That the value—

Of that portion of its property within the state used in intra-
state freight business is in excess of the sum of............ $15,463,678 95
And of such property devoted to intrastate passenger business
is in excess of........................................ $17,365,291 86

That the complainant's total earnings from all freight traffic in the state—

For the fiscal year ending June 30, 1910, were................ $5,463,603 81
Of which there was intrastate................................ $2,217,074 95
And of which there was interstate........................... $3,246,528 86

That complainant's operating expenses, rentals and taxes, excluding fixed charges and any return on investment, for all freight business in the state—

For the fiscal year ending June 30, 1910, were................ $4,409,188 47
And for the fiscal year ending June 30, 1911, were............ $4,893,918 42

That the cost of doing intrastate business is much greater than interstate, from two to five times as great; that the amount of expense properly chargeable to intrastate traffic would reduce the income, under the Commission's order, so as to leave an insufficient amount to constitute a fair return on the property devoted to this use.

That substantially 45 per cent. of complainant's revenue on intrastate freight traffic is derived from that part of the traffic covered by the Commission's order; that, prior to the enforcement of such order, its rates were from 25 to 50 per cent. higher than under the order; that the enforcement of said order would decrease its earnings from that traffic approximately $300,000 annually.

That its total passenger earnings from all sources in the state of Washington—

For the fiscal year ending June 30, 1910, were................ $3,905,050 61
Of which there was intrastate................................ $2,543,264 70
And of which there was interstate........................... $1,361,785 91

That the total of like earnings—

For the fiscal year ending June 30, 1911, was................ $4,180,310 33
Of which there was intrastate................................ $2,512,507 48
And of which there was interstate........................... $1,667,802 85

That its expenses on passenger business in the state of Washington—

For the fiscal year ending June 30, 1910, were................ $3,538,754 79
And for the fiscal year ending June 30, 1911, they were...... $4,221,727 82

That, if complainant should refuse to comply with such orders, a multitude of damage suits against it and its agents would result. That the earnings from any class of freight business can be readily determined, but that the expenses cannot be accurately determined, as the same property is being used at the same time in the carrying of hundreds of daily items of both state and interstate traffic. That it will require an accounting to ascertain the approximate cost of doing purely state business.

That its intrastate transportation earnings for the fiscal year ending June 30, 1910, were approximately 2 per cent. of the value of its property devoted to that business. That for the fiscal year ending June 30, 1911, it was less than 1 per cent. That for the fiscal year ending June 30, 1912, and subsequent years, its earnings, under the old tariffs, would not exceed those of 1910 and 1911, and that for such time, under the tariffs fixed by the Commission's order, its percentage of gain would be much less.

That an important part of complainant's business consists of all rail shipments from different parts of the United States to points in Eastern Washington. That in such trade it must compete with the water and rail routes by way of the Pacific ports. That, by the Commission's order, the water and rail rate for interstate traffic was materially lowered. That complainant and other all-rail carriers, to meet such lowered rate, were compelled to lower their interstate all-rail rate. That this result constitutes an unlawful interference with interstate commerce in violation of article 1, § 8, of the Constitution of the United States.

That, by reducing the rates from Western Washington commercial centers to local distributing points in Washington, near its other boundaries, there will be such a marked discrimination against interstate traffic with points just beyond the borders of the state as to force a reduction in the rate on interstate shipments. That this, also, constitutes an unlawful interference with interstate commerce.

The prayer of the complaint is that the order of the Public Service Commission be vacated as confiscatory, for injunctive relief against the defendants, and for an accounting to determine the value of complainant's property devoted to intrastate freight traffic in Washington.

[1] Under the demurrers, the first ground urged is that there is a misjoinder of parties defendant, in that certain shippers are joined with the members of the state Commission and the state's Attorney General as defendants—it being alleged that they will, unless enjoined, seek to enforce the rates fixed by the Commission. They are sued as representatives of that class of shippers, shipping the commodities affected by the modified rates. Therefore they are proper, if not necessary parties. Though not directly ruled upon, this course has been noticed with apparent approval by the Supreme Court in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. While it is true that, through the Commission and the state's Attorney General, the public is represented, though the state is not sued, yet the shippers joined as defendants are representatives of a class directly and particularly affected.

[2] Even if this point were not so determined, yet, as the demurrer is on the ground that the shippers are neither necessary or proper parties, it follows that they, and not the other parties, who are necessary and proper, alone can object on the ground of misjoinder. 16 Cyc. 205, and citations.

[3] The demurrer also goes to those certain paragraphs of the Great Northern bill which attack the Commission's order, because its result,

it is alleged, will be to regulate and control interstate commerce from Pacific ports with those distributing points outside of the state that are in close competition with points within the state to which latter, the rates are directly affected by the Commission's order. The bill does not name any particular towns or any points affected. Nor does it give any general or specific information concerning the disparity in rates between the points within the state and those claimed to be affected outside of the state. The allegations in these particulars are insufficient.

If the conclusion of the pleader alone, without detailed information, is considered, it is shown that the effect, which it is contended the Commission's rates would have upon interstate rates, is not a necessary or direct result; but, if at all effective, they become so because the carrier—for prudential reasons, to prevent friction with the interstate shippers and possible loss of business on account of too great a disparity between the intrastate and interstate rates to adjacent points— would lower the interstate rate to more nearly conform to the intrastate rate. This is neither the legal .effect of the Commission's order nor the direct result. It is merely incidental, and would not form a basis to avoid the Commission's order on the alleged ground that it will regulate and control interstate commerce, or put a burden thereon. If the rates fixed are just and reasonable, this alone would not defeat the Commission's action. Woodside v. Tonopah & R. G. Co. (C. C.) 184 Fed. 358, 360; O. R. & N. R. R. Co. v. Campbell (C. C.) 173 Fed. 957; Southern Pacific R. R. Co. v. Campbell (C. C.) 189 Fed. 182.

[4] Both bills are demurred to upon the ground that neither states any equitable ground for relief, but that both show affirmatively that the Commission's order is not confiscatory, nor will it deprive complainants of a reasonable and fair return upon the value of their property devoted to the public use. It has been contended in support of the demurrers that, as long as there would be any return to complainants over and above expenses, the Commission's order could not be held to be confiscatory or avoided. Cotting v. Kansas City Stockyards, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. This cannot be held to be the fair and reasonable return upon the investment to which the law gives complainants the right. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892. In support of the demurrer to the Northern Pacific bill, it has been earnestly contended that the court should determine as a matter of law that 4 per cent. per annum—that being approximately the rate of return which the bill admits complainant would receive under the Commission's order—is a fair and adequate return upon the value of complainant's property.

The question of what is a fair and adequate return is a mixed one of law and fact. Complainant in cause No. 1,094 alleges in its bill:

"The return which your orator received, as aforesaid, in the years 1910 and 1911 is about as large as your orator can reasonably anticipate for the future, by reason of increased competitive conditions, * * * and is a less rate than your orator is entitled to have upon its capital invested in the business of transportation, and is a less rate than capital employed in other and somewhat similar business in the state of Washington generally receives."

In Willcox v. Consolidated Gas Co., 212 U. S. 19, at page 49, 29 Sup. Ct. 192, at page 199 (53 L. Ed. 382, 15 Ann. Cas. 1034), it is said:

"Under the circumstances the court held that a rate which would permit a return of 6 per cent. would be enough to avoid the charge of confiscation, and for the reason that a return of such an amount was the return ordinarily sought and obtained on investments of that degree of safety in the city of New York. Taking all the facts into consideration, we concur with the court below on this question, and think complainant is entitled to 6 per cent. as a fair return on the value of its property devoted to public use. * * * Of course, there is always a point below which a rate cannot be reduced and at the same time permit a proper return upon the value of the property. * * *" Central of Ga. R. R. Co. v. R. R. Commission of Ala. (C. C.) 161 Fed. 925; L. & N. R. R. Co. v. Brown et al., R. R. Commissioners (C. C.) 123 Fed. 947; New Memphis Gas & Light Co. v. City of Memphis (C. C.) 72 Fed. 952; Spring Valley Water Co. v. City & County of San Francisco (C. C.) 124 Fed. 574; Milwaukee Elec. Ry. & Light Co. v. City of Milwaukee (C. C.) 87 Fed. 577, 585; Puget Sound Elec. Ry. v. R. R. Commission, 65 Wash. 75, 117 Pac. 739.

[5] It is further contended in support of the demurrers that there is no equity in either bill because there is no allegation of the revenue derived from each class of freight affected by the order, nor an allegation of the expenses properly chargeable against each class.

The Northern Pacific bill shows that, while that complainant and the Commission agree that the total value of the railroad company's property in the state of Washington is $127,250,000, yet they do not agree concerning what portion of this total is used in intrastate commerce; complainant alleging it to be $70,648,971, and the Commission finding it to be $52,172,500. In the Great Northern bill the value of its property devoted to intrastate traffic is alleged to be in excess of $32,828,970.81; but it is alleged that the Commission has found it to be $30,150,000. It is upon the true valuation— if either of these be so—that the complainants are entitled to a fair and reasonable return. Thus one ground of the controversy is disclosed by the bills. The complainants' general distance freight schedule, which was modified by the Commission, provided rates for ten classes of freight. For a distance of five miles the cost was graded down from 10 cents a hundred for the first class, through the intervening eight classes to 2 cents a hundred for the tenth class—class "E." The advance in each rate for the different classes was uniform regarding one another for greater distances than five miles, but the charge by mile uniformly diminished with the increase in the length of the haul. For example: For 100 miles the rate was 60 cents a hundred for first class and 12 cents a hundred for class "E." For 200 miles the rate was $1 a hundred for the first-class freight, and 20 cents a hundred for class "E." For

500 miles the rate was $1.80 a hundred for the first-class freight and 36 cents a hundred on class "E."

The Commission's order recognized and adopted the system of classification embodied in the complainant's tariff, but made a graduated reduction in all the rates of these classes, except the rate for the first five miles. For example, the rate for first class for 100 miles was 50 cents a hundred, instead of 60 cents, a reduction of 16⅔ per cent. For 300 miles the rate was made 91 cents a hundred, instead of $1.40, a reduction of 35 per cent. For 500 miles the rate was made $1.28 a hundred, instead of $1.80, a reduction of a little more than 28 per cent. By the order of the Commission, it was provided that the rates for the second, third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth classes should not exceed 85, 70, 60, 50, 50, 40, 30, 25 and 20 per cent., respectively, of the first-class rate. Other tariffs were affected by the Commission's order, but, like the foregoing, the reduction and changes were made with mathematical uniformity. This is enough to disclose that the Commission's order, changing the tariff in this manner, was done to absorb what was conceived to be a general overcharge arising from some basic difference as an overvaluation of the property devoted to intrastate use. To absorb this general overcharge, a uniform reduction was made. It is thus made apparent that the controversy does not apply to this or that particular one of these 10 classes of freight in any way different from the others; but that it concerns them all. The Commission by adopting the same uniform ratio for the reduction in freight rates from first class down to the tenth, or "E," class, shown in the railroad's tariff, conceded the proper exercise by the railroad of a discretion in the matter of classification, so far as the class rates are related to one another.

This contention is made on what is conceived to be the authority of Cotting v. Kansas City Stockyards, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. But, even in that case, it is warningly said:

"The court (Supreme Court) has held that the Legislature may not prescribe rates which, if enforced, would amount to a confiscation of the property. But it has not held affirmatively that the Legislature may enforce rates which stop only this side of confiscation and leave the property in the hands and under the care of the owner, without any remuneration for its use."

If the Commission had attempted to reform the rates as a whole (Cotting v. Kansas City Stockyards, supra, at page 89 of 183 U. S., 22 Sup. Ct. 30, 46 L. Ed. 92), then the statements of totals, as in the Northern Pacific bill, would probably have been sufficient. The carrier is not primarily concerned as to the uniformity of the rates, and cannot complain of what it names as discrimination in rates "so long as the total is enough to furnish such return"—a reasonable return upon a fair valuation of its property. "It is not important that, with relation to some customers, the price is not enough." Willcox v. Consolidated Gas Co., 212 U. S. 19, at page 54, 29 Sup. Ct. 192, at page 201 (53 L. Ed. 382, 15 Ann. Cas. 1034).

But the converse is not, necessarily, true. The particular shippers and the public do have an interest in the uniformity of the rates, and there should be no discrimination "for which good reasons cannot be given." Id. In the absence of any allegation concerning the rates not affected by the order, under certain circumstances, the presumption might be warranted that such other rates were properly adjusted—neither too high nor too low—but in the present controversy the rates, the source of revenue, and the expenses are interdependent, and it is not only necessary to determine whether the total revenue is threatened with confiscation or depreciation beyond what is a reasonable and fair return, but it is necessary to ascertain whether the rates affected are to bear too little of the burdens of the total traffic, or whether they have been bearing too much of that burden. This cannot be shown until the modified intrastate rates are segregated from those which the Commission did not touch in its order and the rate of income from each and the expenses chargeable to each are disclosed. These rates are on trial more particularly than the entire intrastate freight rates.

Complainants have recognized the necessity of setting out the revenue from passenger business, as well as freight. This must be done under any circumstances to establish that the total revenue is not unreasonably high. Being armed with the right of eminent domain, the right to take for its use the property of the individual at its fair market value, the public is entitled to the services of the common carrier at what they are reasonably worth—at least so long as such services so furnished will afford the carrier a reasonable return upon its property devoted to the public use. The public, therefore, has the right to freight rates in which there is no unreasonable discrimination against any locality or class of freight. The tabulation of values, revenues, and expenses in both bills of complaint fail to disclose the net revenue derived in the past under the old rates from the classes of freight included in the Commission's order. They do not disclose the amount of expenses properly chargeable to those classes; nor set out any estimate of what the revenue and expense would be on the same under the Commission's order. They do not disclose what, if any, net revenue has been realized from the intrastate freight rates not affected by the order, nor whether the same were carried at a profit or loss.

The Great Northern bill does not show the expenses properly chargeable to intrastate freight, alleging that the expenses cannot be ascertained with mathematical certainty. The presumption upon demurrer would, therefore, be that freight, other than in those classes affected by the order, was not carried at a profit. There must be some point beyond which a carrier cannot go in discriminating in freight charges against various classes of freight, else one class may be compelled to bear the expense of the whole traffic.

Without deciding the question finally upon these demurrers, it is held that it is not sufficient to justify the revenue received on

the freight rates as a whole, but that the facts should be given justifying the rates, as a whole, changed by the Commission; that this cannot be done without a segregation of those classes and rates from the others. It is stated in the bills the number of ton miles carried intrastate, the cost per mile of the freight so carried, that the effect of the Commission's order would be to reduce the Northern Pacific's income $200,000 per annum and the Great Northern's income $300,000 per annum; that 45 per cent. of the Great Northern's intrastate freight revenue is derived from the rates modified by the Commission's order.

While the foregoing does not furnish the requisite information, it does show, with the other facts alleged, a sufficient grasp of the details of the business in these particulars to enable the complainants to furnish approximately correct statements of these amounts, and this before entering upon a reference and accounting. The difficulty in forming a reasonably accurate estimate of the amount to be credited and charged to the different classes of freight traffic is obvious, especially so as its subdivision into different classes is extended. The Supreme Court has said: "How speculative" are these figures that are "set down with delusive exactness." City of Louisville v. Cumberland Tel. & Tel. Co., 225 U. S. 430, 32 Sup. Ct. 741, 56 L. Ed. 1151; Southern Pacific Ry. Co. v. Railroad Commission (D. C.) 193 Fed. 699; South. Pac. Ry. Co. v. Campbell (C. C.) 189 Fed. 182.

The foregoing shows the more need of a painstaking effort to narrow the issues and develop with precision all the equities of the cause from its inception. The allegations in the bills concerning the danger of incurring great daily penalties, if the Commission's order was not complied with, were evidently inserted as a ground justifying the asking of equitable relief and not as an attack upon the commission law itself under the fourteenth amendment to the Constitution of the United States. Willcox v. Consolidated Gas Co., 212 U. S. 19, at pages 53, 54, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Berea College v. Commonwealth of Kentucky, 211 U. S. 45, 54, 29 Sup. Ct. 33, 53 L. Ed. 81.

The demurrers will be sustained.