Argued November 22, 1935; reversed March 17, 1936

# OREGON-WASHINGTON RAILROAD & NAVIGATION CO. ET AL. *v.* McCOLLOCH

(55 P. (2d) 1133)

*Roy F. Shields*, of Portland (A. C. Spencer, of Portland, on the brief), for appellant Oregon-Washington Railroad & Navigation Co.

*A. A. Hampson* and *Paul P. Farrens*, both of Portland, for appellant Southern Pacific Co.

*Carey, Hart, Spencer & McCulloch* and *Fletcher Rockwood*, all of Portland, for appellants Northern Pacific Ry. Co. and Great Northern Ry. Co.

*Willis S. Moore*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondents Frank C. McColloch and I. H. Van Winkle.

*William P. Ellis*, of Salem, for other respondents.

BAILEY, J. This suit was instituted by the Oregon-Washington Railroad & Navigation Company, Southern Pacific Company, Northern Pacific Railway Company and Great Northern Railway Company, as plaintiffs, against the public utilities commissioner and the attorney general of the state of Oregon, and some 55 shippers, as defendants, to set aside two orders of the public utilities commissioner, to enjoin the defendant state officials from instituting proceedings to enforce said orders and to enjoin the defendant shippers from instituting and prosecuting actions to recover the reparation awards contained in the second of such orders.

The first of these orders, designated as P. U. C. Oregon order No. 2093, was made on March 27, 1933, on an amended complaint filed with the public service commission of Oregon, since replaced by the public utilities commissioner, wherein the defendants in this suit and several other shippers were named as defendants. The findings on which the order was based were to the effect that the rates and charges enforced and exacted by the carriers for shipments of grain from the interior of Oregon to Portland were "unjust, unreasonable and unlawful to the extent that they exceeded the maximum distance scales of rates prescribed in" orders No. 1040 and No. 1131; that the refusal of the carriers to grant certain shippers milling in transit privileges was contrary to the spirit and intent of orders No. 1040 and No. 1131 and "resulted in exaction of unjust, unreasonable and unlawful charges";

and that the refusal of the carriers to grant to shippers the right and benefit of diversion or reconsignment of shipments on rates fixed by orders No. 1040 and No. 1131 resulted in imposing upon the shippers "charges in excess of those found therein to be just and reasonable".

In his order No. 2093 the public utilities commissioner, hereinafter to be mentioned, for the sake of brevity, as the commissioner, directed the shippers named in the amended complaint upon which such order was based, to file with the commissioner within a time fixed statements showing the details of shipments on which reparation was claimed by the shippers, in accordance with rule 25 of "Rules of Practice and Procedure" promulgated by the commissioner, and further ordered the carriers to "cease and desist from the violations" mentioned in the commissioner's findings.

The second of the orders, designated as P. U. C. Oregon order No. 2220, entered February 21, 1934, awarded reparation in excess of $211,000 with interest from the date of the payment of the freight charges, to some 55 shippers, all of whom are made defendants in this suit. The separate awards to individual shippers ranged from $2.56 to $74,458.44. Of the total amount of reparation, all except $1,597.96 was awarded against the Oregon-Washington Railroad & Navigation Company alone.

This case comes before us on appeal from a decree dismissing the suit after plaintiffs' refusal to plead further, upon the sustaining of defendants' demurrer to the complaint. The facts to be considered are therefore those alleged in the complaint and admitted by the demurrer.

Copies of the two orders of the commissioner, Nos. 2093 and 2220, and the amended complaint on which

such orders were based, were, as exhibits, attached to and made a part of the complaint in this suit. The facts as stated in the complaint are as follows: On February 28, 1929, "the defendant shippers filed with the public service commission of Oregon a complaint against the plaintiffs herein to recover certain alleged overcharges not stated or identified in any manner in said complaint". A year later these same shippers filed with the public service commission an amended complaint, to which the plaintiffs herein filed their respective answers denying each and every allegation in said amended complaint except averments as to the corporate character of the plaintiffs and defendants therein named.

The claims asserted by the shippers against the carriers comprise four general classes. The first of these classes, approximating 99.2 per cent of the total demand, includes "claims based on interstate and foreign shipments originating at interior points in Oregon and moving by rail to Portland and thence by water or rail to destinations in other states or in foreign countries". As to such shipments the carriers applied and collected the rates fixed by the interstate commerce commission, which were prescribed in the carriers' published tariffs on file with that commission. As to this freight the shippers contend that the rates prescribed by the public service commission of Oregon for intrastate movements, generally lower than the interstate rates, should have been applied and collected.

Class 2 of the claims, comprising approximately .005 per cent of the total shipments, is "based on intrastate movements as to which the shippers claimed 'milling in transit' privileges". Regarding these claims, the shippers' contention is that P. S. C. order

No. 1131, entered August 29, 1924, required the carriers to permit shipments of grain to be stopped at intermediate points for milling and then to be moved from such intermediate points to ultimate destination, on the same rate from point of origin to ultimate destination as though said shipments had not been stopped, unloaded and reloaded from said intermediate points but had moved continuously from originating point to final destination. On these shipments the carriers charged and collected the local rate from the point of origin to the intermediate point plus the local rate from the latter point to the ultimate destination.

Class 3, approximating .0014 per cent of the total amount, included demands arising out of shippers' claims to diversion and reconsignment privileges without extra charge. In regard to those movements of freight the shippers' contention is that order No. 1131 required the carriers to grant to the shippers the same rate as though the shipments had been billed originally "straight through to the final destination". The rates charged and collected by the carriers were those prescribed in their tariffs for such movements to and from the reconsignment or diversion point.

Class 4 consists of miscellaneous claims, comprising less than 1 per cent of the whole, arising out of alleged overcharges on a few minor and incidental movements, based on the contention that the carriers have charged and collected rates in excess of those prescribed by the defendant commissioner or his predecessors.

The amended complaint filed with the commission alleged that the rates which had been charged and collected by the carriers were "unreasonable, unjustly discriminatory and unjustly prejudicial". No evidence was introduced to prove these allegations. All that the complainants attempted to show in the proceedings

before the commission was that the rates actually charged by the carriers were in excess of those prescribed theretofore by the commission.

The shippers at no time requested the commissioner to determine "upon and fix any rate, charge, practice or regulation not then and theretofore in effect, or to grant any relief except only to award to defendant shippers specific sums of money to be computed by deducting from the total charges collected by the carriers the amounts which defendant shippers claimed should have been collected under the carriers' tariff then and theretofore on file and in effect".

Testimony was taken before an examiner appointed by the commissioner, at various times between April 1, 1931, and August 1, 1932, with respect to some of the items of the defendants' claims. But such testimony was, at the direction of the commissioner, confined to less than 1 per cent of the total of said items, "although the carriers requested leave to offer evidence as to each and all of said items, which request was denied and refused" by said commissioner. Based upon such testimony, the commissioner made and entered order No. 2093, hereinbefore referred to, and in pursuance of said order, under rule 25 above mentioned, the carriers filed with the commissioner a prepared statement showing as to each shipment the origin and destination as indicated by the railroad bill of lading, also car number and initial, weight of shipment, date of shipment, rate charged and collected, rate claimed to be applicable, the amount claimed to be the correct charge, and the alleged overcharge. These statements did not show who paid the freight, the final destination of shipments moving through Portland and beyond, nor any facts characterizing such shipments as intrastate, interstate or foreign, "save only that it did show the

destination shown on the original bill of lading''. The statements so filed by the shippers were later delivered to the carriers, which certified that 99.2 per cent of the shipments constituted ''part of a continuous rail and water movement from such originating point via the carrier's line of railroad through Portland to an ultimate interstate or foreign destination''; and that the freight charges actually imposed and collected were in accordance with the applicable and lawful interstate rates. The carriers further certified that with respect to each shipment the items listed under the heading ''reparation'' in the statements furnished by the shippers did not represent reparation, but indicated ''an alleged overcharge consisting of the difference between the freight charges based on the interstate rates applicable to said shipments and the freight charges based on the intrastate rate which'' the shippers contended to be applicable to said shipments.

As to class 2, class 3 and class 4 claims, the carriers certified that the freight rates charged were the correct, applicable and lawful rates ''prescribed in the tariffs of the carriers duly promulgated, published and filed with the public service commission'', and that the items listed under the heading ''reparation'' did not in fact represent reparation, but alleged overcharges. There was no dispute between the shippers and the carriers as to the actual shipments and the rates charged and collected.

The commissioner, without taking or receiving any evidence to determine the facts with reference to the statements contained in the carriers' certificates, entered order No. 2220, awarding reparation to the shippers in the aggregate amount hereinbefore mentioned.

The complaint alleges that order No. 2093, entered March 27, 1933, and order No. 2220, entered February

21, 1934, are both arbitrary, unreasonable and unlawful and "should be declared to be void and of no effect for each and all of the several reasons and on account of the facts hereinafter stated". The following reasons are set forth for declaring those orders null and void: that the only claims which the shippers attempted to ascertain or establish in proceedings before the commissioner were based solely and exclusively on the contention that rates in excess of those prescribed by the tariffs applicable to such movements were alleged overcharges; that no evidence was offered or received bearing upon the reasonableness of the rates collected by the carriers, or the reasonableness of the rates which the shippers claim to be applicable to said movements; that each of the shipments listed in class I hereinbefore mentioned was part of an interstate or foreign shipment and that the rates actually applied and collected were rates lawfully prescribed by the interstate commerce commission.

Additional reasons advanced by the complaint are that with respect to shipments listed in class 1, the whole controversy in the proceedings before the commissioner was confined to the question of whether the movement of said shipments by rail was interstate or intrastate in character; that certain evidence was introduced showing the shipments and the commissioner's ruling that the facts so offered by the shippers were the only pertinent facts to be considered in determining whether the shipments were interstate or intrastate; that the commissioner refused to receive or consider testimony which the carriers contended would show that such shipments were not in fact intrastate but were interstate and foreign shipments; that the shipments mentioned in orders Nos. 2093 and 2220 moved on various dates between February 11, 1924, and April 9,

1931; that more than 35 per cent thereof moved, and freight charges thereon were paid, between February 11, 1924, and March 1, 1927; that with respect to claims based on said shipments the complaint was not filed with the public service commission "within two years from the time the cause of action, if any, accrued thereon, and therefore if said claims were in fact claims of reparation, they were barred by the provisions of section 62-128, Oregon Code"; that during the hearings the carriers objected to allowance of proof of claims with respect to shipments prior to March 1, 1927, because the same were barred by the statute of limitations; and that the commissioner overruled the objections and refused to apply the statute of limitations to said claims.

As a further ground for asserting that such orders were void, it is stated that all the shippers, excepting some few whose claims aggregate approximately $2,500, are brokers and dealers in grain, and that they had suffered no pecuniary loss or damage, because the grain purchased by them as such brokers and dealers was "bought on the basis of the Portland market price, less the freight charges from point of origin to Portland", and "the freight charges on said shipments from point of origin to Portland were in fact paid by the grower or producer by deducting such charges from the purchase price".

As to claims comprised in class 2, requiring carriers to grant milling in transit privileges, no evidence was offered "as to the reasonableness of requiring such transit privileges as of the dates when said shipments moved"; and it is averred that such order was based solely on said commissioner's conclusion that order No. 1131 granted such privileges. Similar allegations are set forth regarding the absence of testimony as to

class 3 claims relating to diversion and reconsignment privileges.

It is further stated in the complaint herein that the defendants intend to and will, unless restrained, file an action or actions to enforce obedience by the plaintiff carriers to order No. 2220, to collect from the plaintiff carriers the respective amounts of the reparation awards made by the commissioner; that in such actions the shippers will introduce in evidence order No. 2220 as *prima facie* proof that the sums therein mentioned are due to defendant shippers respectively, from the plaintiff carriers or some one or more of them; and that on the face of the record without disclosure of the facts set forth in the complaint showing the basis or absence of basis for said order, the order would be entitled to be received as *prima facie* proof in such actions. Numerous reasons are then set out why the order should not be received as *prima facie* evidence of the facts therein stated, many of such reasons being similar to those hereinbefore stated. In addition thereto, it is averred that to place upon the carriers the burden of rebutting the presumption based on the reparation order of the commissioner would require the carriers "to incur heavy and prohibitive expense, aggregating a substantial proportion of the amount involved in such litigation, to disprove what has never been proved, with no possibility of recovering from defendant shippers, as costs or otherwise, the expense so incurred, because of the statutory provision (section 62-127, Oregon Code 1930) that in such action at law no costs or disbursements may be recovered from such shippers".

As a further objection to orders Nos. 2093 and 2220, the plaintiffs herein allege that the claims listed in the amended complaint before the commissioner, together

with those thereafter added by supplemental lists, aggregated $259,587.73; that many of the claims so listed were disallowed, but that neither of said orders mentioned in this paragraph identified those claims which were allowed or those which were disallowed; and that neither of said orders contains any means of determining the identity of the claims allowed or disallowed.

We have not attempted to set forth fully and in detail all the facts alleged in the complaint in this suit, as it, together with exhibits, consists of some 116 pages in the printed abstract of record. Reference should be made briefly to a few statements contained in the exhibits. In order No. 2093 of the commissioner it is recited that on January 19, 1924, the public service commission issued its order No. 1040, which found that the then existing rates applicable to intrastate transportation of grain and grain products, in so far as the same exceeded the rates prescribed in such order, were unlawful, unreasonable and unjustly discriminatory against the shippers, and required the carriers before February 11, 1924, to establish rates as prescribed in the order.

Thereafter proceedings were instituted against the commission to enjoin the enforcement of order No. 1040, and upon receiving evidence in the court proceeding the matter was re-referred to the commission, which modified order No. 1040 by the issuance of its order No. 1131. Order No. 1040 as modified by order No. 1131 was sustained by decree of the circuit court, which the supreme court affirmed in the case of *Oregon-Washington Railroad & Navigation Company v. Corey,* 120 Or. 517 (252 P. 955). During the court proceedings therein the enforcement of the commission's order was enjoined by the carriers' giving a bond as required by

law. Upon the entry of the mandate the injunction was dissolved. The tariff naming the rate prescribed in said order was published on February 26, 1927, and became effective on March 1 of that year. This order of the commission recited in some detail the evidence before the commission and pointed out that hearings had been continued at intervals for over a year, and that 5,269 pages of transcript of testimony had been taken, in addition to the introduction of several hundred pages of documentary evidence.

A large part of the commissioner's discussion of the issues before him has to do with the legal question of whether the shipments under consideration constitute interstate or intrastate movements of freight.

One of the principal contentions of the plaintiff carriers in this suit is that in excess of 99 per cent of the amount of money which the commissioner ordered the carriers to repay to shippers was based on movements of grain in interstate or foreign commerce; that the commissioner had no jurisdiction over such shipments; and that the shippers were attempting to recover from the carriers as overpayment the difference between the interstate rates from interior points to Portland on shipments in interstate or foreign commerce, and the applicable intrastate rates between such interior points and Portland.

■ Regardless of whether these shipments were interstate or intrastate, the carriers contend that the commissioner has no jurisdiction to award reparation to the defendant shippers on the basis of the facts shown in this case, for the reason that § 62-126, Oregon Code 1930, on which the defendant shippers rely, has no application to repayment of overcharges or refund of charges paid in excess of the published lawful tariffs.

The shippers, on the other hand, maintain that the commissioner does have jurisdiction under § 62-126, *supra*, to order the repayment of overcharges, and that the word "reparation" includes in its meaning repayment of overcharges as well as refunding of that part of collected charges found to be excessive after determination by the commissioner that the rates on which such charges were based were unjust and unreasonable. Section 62-126 provides as follows:

"If, after hearing on a complaint made as provided in section 62-125, Oregon Code, with respect to intrastate commerce, the public service commission shall determine that any party complainant has suffered a pecuniary loss or damage by reason of the imposition or collection by any common carrier, railroad or transportation company, of rates, fares or charges in violation of section 62-103 or 62-111, Oregon Code, the public service commission shall make an order directing the carrier to pay to the complainant on or before the day named the sum found to have been imposed upon or collected from him in violation of aforesaid section 62-103 or 62-111, Oregon Code."

The foregoing section was a part of chapter 264, Laws 1923, and was amended by chapter 135, Laws 1925. The railroad commission act passed in 1907 (Laws 1907, chapter 53) included as a part thereof §§ 62-125, 62-111 and 62-103, *supra*, which sections have not since been amended.

According to the provisions of § 62-126, *supra*, it is only "after hearing on a complaint made as provided in § 62-125" that the commissioner has authority to "make an order directing the carrier to pay to the complainant . . . the sum found to have been imposed upon or collected from him in violation of" § 62-103 or § 62-111.

Section 62-125, *supra*, provides in part as follows:

"Upon complaint of any person . . . that any of the rates, fares, charges or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, or that any regulation or practice whatsoever affecting the transportation of persons or property, or any service in connection therewith, are in any respect unreasonable or unjustly discriminatory or that any service is inadequate, the commission may notify the railroad complained of that complaint has been made, and ten days after such notice has been given the commission may proceed to investigate the same as hereinafter provided. * * * If upon such investigation the rate or rates, fares, charges or classifications, or any joint rate or rates, or any regulation, practice or service complained of shall be found to be unreasonable or unjustly discriminatory, or the service shall be found to be inadequate, the commission shall have power to fix and order substituted therefor such rate, or rates, fares, charges or classification as it shall have determined to be just and reasonable and which shall be charged, imposed and followed in the future, and shall also have the power to make such order respecting such regulations, practice or service as it shall have determined to be reasonable, and which shall be observed, followed, used and supplied in the future."

The above section authorizes the filing of a complaint with the commissioner when the unreasonableness of rates, fares, charges or classifications is made an issue, and the procedure to be followed in case such a complaint is filed is outlined. Nowhere in the section is there any language expressly authorizing a complaint to be filed with the commissioner to the effect that charges made are in excess of those based on published tariffs or in excess of the maximum rates theretofore prescribed by the commissioner. If the only complaint which the shipper had was that he had been over-

charged, there would be no issue before the commissioner as to the reasonableness of rates, and no necessity of determining just and reasonable rates to be charged in the future.

Section 62-126, *supra*, provides that if the commissioner, after a hearing on complaint as provided in § 62-125, shall determine that any party complainant has suffered damage by reason of the imposition of rates in violation of § 62-103 or § 62-111, he shall make an order directing the carrier to pay the complainant the sum found to have been imposed or collected in violation of § 62-103 or § 62-111. The only distinction between these two sections last mentioned is that the latter applies to joint rates, and the former to rates of individual companies. Both sections require every railroad "to furnish reasonable, adequate service" and direct that the charges made for such service shall be reasonable and just.

It is therefore apparent, when we construe § 62-126 in connection with the other sections therein referred to, that the legislature had in mind, in enacting that section, to confer upon the public utilities commissioner authority when investigating rates to award reparation in those instances in which he should find that shippers had been damaged by the application of unjust and unreasonable rates.

In *Great Northern Railway v. Merchants' Elevator Company*, 259 U. S. 285, 291 (42 S. Ct. 477, 66 L. Ed. 943), the court said:

"Whenever a rate, rule or practice is attacked as unreasonable or unjustly discriminatory, there must be preliminary resort to the commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to

judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the commission."

It is obvious from the foregoing excerpt that the court distinguishes between an unreasonable rate and an overcharge. In one sense an overcharge is the result of an unreasonable rate, but as used in § 62-125 the word "unreasonable" does not have reference to charges based on rates in excess of those established. The respondents other than the state officials argue that § 62-126 confers authority upon the commissioner to award reparation when overcharges alone are involved, although such a contention is somewhat inconsistent with the following statement in their brief:

"An examination of this statute [§§ 62-126 to 62-132, inclusive] discloses that a determination by the commission that the rates exacted were unjust and unreasonable is an indispensable condition precedent to an award of reparation. In other words, the commission must first perform its quasi-legislative or administrative function of determining what rate is just or reasonable before it can properly exercise the quasi-judicial function of finding and awarding reparation of damages. This accounts for the fact that two separate orders were made in the proceeding, as is usual in cases involving reparation."

There is no necessity of resorting first to the commission in those instances in which the only question involved is an overcharge, *i. e.*, a charge in excess of that called for by established rates, whether such rates have been fixed by determination of the commissioner or by the filing of a published tariff.

■ The respondents assert that the Oregon reparation statute [§§ 62-126 *et seq.*] was patterned after that part of the interstate commerce act that relates to award of reparation and refund of overcharges; that the courts have held that the interstate commerce act permits the determination by the commission of the amount of reparation for overcharges to be awarded the shipper; and that therefore our act should be given a similar construction.

The interstate commerce act, 49 U. S. C. A., is, however, much broader than the Oregon statute. Section 8 thereof provides that in case any common carrier subject to the act shall do or cause to be done or permitted to be done any act, matter or thing prohibited by the act or declared to be unlawful, it shall be liable to the person or persons injured thereby for the full amount of damage sustained in consequence of any such violation of the act. Section 9 gives to any person claiming to be damaged by any common carrier the right to make complaint to the commission as thereafter in the act provided, or to bring suit in his own behalf in any district court of the United States for the recovery of the damage for which the carrier may be liable under the act; and further provides that such person shall not have the right to pursue both of those remedies.

Section 13 (1) gives to any person complaining of anything done or omitted by a common carrier the right to file a petition with the interstate commerce

commission, whereupon a copy of the complaint so made shall by the commission be forwarded to the carrier and if the carrier "within the time specified shall make reparation for the injury alleged to have been done", it shall be relieved of liability to the complainant, "only for the particular violation of law thus complained of". If the carrier fails to satisfy the complainant within the time specified, the commission is empowered to make such an investigation as it deems proper.

Section 16 (1) provides that if, after hearing on complaint made as provided in § 13, the commission shall determine that any party complainant is entitled to an award of damages, it "shall make an order directing the carrier to pay to the complainant the sum to which he is entitled, on or before a day named". The remainder of § 16 provides that, in the event the order is not complied with, the complainant or any person for whose benefit the order is made may file in the district court of the United States "a petition setting forth briefly the cause for which he claims damages, and the order of the commission in the premises". This section further directs that such suit shall proceed in all respects as other civil suits for damages, except that "on the trial of such suit the findings and order of the commission shall be *prima facie* evidence of the facts therein stated"; and that the petitioner shall not be liable for costs in the district court, but, in case he prevails, shall be entitled to reasonable attorneys' fees.

Under subdivision 3 of § 16 it is provided that all complaints against carriers for the recovery of damages "not based on overcharges, shall be filed with the commission within two years from the time the cause of action accrues" and an action at law for the recovery

of overcharges "shall be begun or complaint filed with the commission" within three years from the time the cause of action accrues. In the same subdivision it is further specified: "The term 'overcharge' as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission".

Reverting to the Oregon law, we find that under § 62-127 upon the failure of the carrier to comply with the order of the commissioner issued pursuant to § 62-126, the complainants are given the right to file a "petition" in the state court, setting forth the causes for which they claim damages, and the order of the commissioner. Such action shall proceed as other civil actions for damages, except that the findings and order of the commissioner shall be *prima facie* evidence of the facts therein stated. Section 62-128 provides that all complaints for the recovery of damages shall be filed with the commissioner within two years from the time the cause of action accrues, and a "petition" for the enforcement of the order shall be filed in court within one year from the date of the order.

The Oregon law, unlike the federal act, does not grant to the shipper an election to institute an action in court or to file a complaint with the commissioner. Nor does the state law provide that in the event an election is made it shall be exclusive. In addition, the Oregon act fails to state the time within which actions may be filed in the state court when resort to the commissioner is not necessary.

Although the Oregon law in several of its provisions is similar to the interstate commerce act, nevertheless, as already pointed out, the state law is not so broad and comprehensive as the federal act. Prior to the passage of the Oregon law relating to reparation,

in 1923, this court had held in the case of *Service Lumber Co. v. Sumpter Valley Railway Co.,* 67 Or. 63 (135 P. 539), that overcharges might be recovered in an action for money had and received.

██ The language of § 62-126, conferring authority upon the public utilities commissioner to order reparation and to determine the amount thereof, is limited to those instances in which some administrative function or discretion is involved, and does not include cases in which the court has jurisdiction without prior finding or order by the commissioner as to the reasonableness of any rate, rule or regulation. The commissioner's jurisdiction is limited. His authority must affirmatively appear from the law creating his office and defining his powers: *Northern Pacific Railway v. Public Service Commission,* 47 Fed. (2d) 778. We conclude that the Oregon law relating to reparation does not cover overcharges.

In *Baer Bros. v. Denver & R. G. R. R.,* 233 U. S. 479 (58 L. Ed. 1055, 34 S. Ct. 641), with reference to the matters of reparation and rates the court observed:

"That the two subjects of reparation and rates may be dealt with in one order is undoubtedly true: Texas & Pac. Ry. v. Abilene, 204 U. S. 426, 446; Robinson v. Balt. & Ohio R. R., 222 U. S. 506, 509. But awarding reparation for the past and fixing rates for the future involve the determination of matters essentially different. One is in its nature private and the other public. One is made by the commission in its quasi-judicial capacity to measure past injuries sustained by a private shipper; the other, in its quasi-legislative capacity, to prevent future injury to the public."

██ All proceedings before the commissioner for reparation under § 62-126, as that section is here interpreted, involve a finding by him in his quasi-legislative

capacity. Before ordering reparation he must first find that the rates or practices complained of are unreasonable, discriminatory or otherwise violative of § 62-103 or § 62-111. His determination of that question adverse to the carrier is subject to review in court: § 62-136, Oregon Code 1930. By this suit the carriers ask that the order of the commissioner entered March 27, 1933, to the effect that certain rates and practices were unreasonable, be vacated and set aside on the ground that there was no evidence of the unreasonableness of such rates or practices. Sufficient facts were alleged in this respect to constitute a cause of suit. See, in this connection, *Borst v. Chicago & Northwestern Railway Co.*, 3 F. Supp. 139, 142, and authorities therein cited.

■ A court of equity, however, has no jurisdiction to set aside an order awarding reparation to a shipper. Section 62-136, *supra*, does not apply to such an order. The order awarding reparation was made by the commissioner in his quasi-judicial capacity. It is not final; no execution could issue on it. The action in court after refusal of the carriers to pay the amount of the reparation is not brought on the award as such.

In *Meeker & Co. v. Lehigh Valley R. R.*, 236 U. S. 412, 430 (59 L. Ed. 644, 35 S. Ct. 328, Ann. Cas. 1916B, 691), the court said:

"It is also urged, as it was in the courts below, that the provision in § 16 that, in actions like this, 'the findings and order of the commission shall be *prima facie* evidence of the facts therein stated' is repugnant to the constitution in that it infringes upon the right of trial by jury and operates as a denial of due process of law.

"This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most,

therefore, it is merely a rule of evidence. It does not abridge the right of trial by jury or take away any of its incidents. Nor does it in any wise work a denial of due process of law. In principle it is not unlike the statutes in many of the states whereby tax deeds are made *prima facie* evidence of the regularity of all the proceedings upon which their validity depends. Such statutes have been generally sustained, Pillow v. Roberts, 13 How. 472, 476; Marx v. Hanthorn, 148 U. S. 172, 182; Turpin v. Lemon, 187 U. S. 51, 59; Cooley's Constitutional Limitations, 7th Ed., 525, as have many other state and federal enactments establishing other rebuttable presumptions.''

See, also, *Cleveland C. C. & St. L. Ry. Co. v. Blair*, 59 Fed. (2d) 478, and *Lewis-Simas-Jones Co. v. Southern Pacific Co.*, 283 U. S. 654, 661 (75 L. Ed. 1333, 51 S. Ct. 592).

In *Pittsburgh & W. V. Ry. Co. v. United States*, 6 Fed. (2d) 646, in holding that a court of equity has no jurisdiction to set aside an award of reparation, the court said:

''An order of the commission awarding reparation is not a cause of action. Nor is it in the nature of a judgment on which execution may issue. It is an award of money damages and is declared by statute to be evidence, and then only *prima facie* evidence, of the facts found by the commission (section 16 of the interstate commerce act of February 4, 1887 (24 Stat. 379), as amended by section 13 of the act of June 18, 1910 (36 Stat. 539 [Comp. St. § 8584]), to be used only as such in an action which may be instituted after default by a carrier to obey the order of payment. The provision in section 16 of the act that, 'the findings and order of the commission shall be *prima facie* evidence of the facts therein stated' has been held by the supreme court only to establish a rebuttable presumption. 'It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most, therefore, it is merely

a rule of evidence. It does not abridge the right of trial by jury or take away any of its incidents. Nor does it in any wise work a denial of due process of law.' Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 35 S. Ct. 328, 59 L. Ed. 659; Hillsdale C. & C. Co. v. Pennsylvania R. Co. (D. C.), 237 F. 272; Minds v. Pennsylvania R. Co. (D. C.), 237 F. 267; Id. (C. C. A.), 244 F. 53; Pennsylvania R. Co. v. Minds, 250 U. S. 368, 39 S. Ct. 531, 63 L. Ed. 1039; Pennsylvania R. Co. v. Weber (C. C. A.), 269 F. 111; Id., 257 U. S. 85, 42 S. Ct. 18, 66 L. Ed. 141; Mills v. Lehigh Valley R. Co., 238 U. S. 473, 482, 35 S. Ct. 888, 59 L. Ed. 1414.

"Having full and adequate opportunity at law to present all its defenses in a single suit brought after an award of reparation has been granted, the petitioners have the same adequate opportunity to make full defense in the several suits covered by the order in question without assistance from a court of equity."

With reference to the matter of equitable relief for the purpose of avoiding multiplicity of actions, the court there further observed:

"A party liable in more than one action at law is not in every instance entitled to equitable relief on the ground of avoiding multiplicity of suits. Multiplicity and multitude are not synonymous words. There must be in the situation something more than mere number of suits. 'A court of equity ought not to interfere . . . unless it is clearly necessary to protect the plaintiff from continued and vexatious litigation:' " citing Boise, etc., Co. v. Boise City, 213 U. S. 276 (53 L. Ed. 796, 29 S. Ct. 426).

The reasoning in the above opinion applies to the case at bar and is a complete refutation of the appellants' contention that a court of equity has jurisdiction to set aside an order awarding reparation. A contrary holding would subject every order of reparation to attack in a suit in equity and unnecessarily delay

determination of the right of recovery in an action at law.

■ The fact that the shippers in this case were brokers or dealers in grain and that they purchased grain on the basis of delivery at Portland market prices does not preclude them from being entitled to reparation: *Adams v. Mills,* 286 U. S. 397 (76 L. Ed. 1184, 52 S. Ct. 589).

■■ One of the grounds of demurrer to the complaint was that in it several causes of suit were improperly united. One of the purposes of the suit was to have order No. 2093 of the commissioner, entered March 27, 1933, set aside for the reason that there were insufficient facts to support any finding that the rates collected were unreasonable and unjust. The commissioner was a proper party to this suit, and the shippers were interested in upholding this order because the order of reparation was based on it. The demurrer was filed by all the defendants jointly and if the complaint was good as to any one of the defendants the demurrer should have been overruled. In this proceeding the plaintiffs attempted to enjoin enforcement of both orders, Nos. 2093 and 2220, the latter of which was based on the former.

It is customary in this state and elsewhere to join with a public official, such as the commissioner in this instance, in a suit to set aside his order, those who obtained the order as complainants before him: *Northern Pacific Railway Co. v. Lee,* 199 Fed. 621. The complaint was not vulnerable to demurrer on that ground.

The decree appealed from is reversed and the cause remanded for such further proceedings as are not inconsistent with this opinion. Neither appellants nor respondents will recover costs in this court.